1    IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4
5   MARVIN JONES,                    )
              Plaintiff,             )
6       vs.                          ) No. 14 CV 6843
    VILLAGE OF CRESTWOOD,            )
7   UNKNOWN AND UNNAMED              )
    VILLAGE OF CRESTWOOD             )
8   POLICE OFFICERS,                 )
    HAZEL CREST POLICE               )
9   OFFICER DERRICK A.               )
    CHAMBLISS and UNKNOWN            )
10  AND UNNAMED VILLAGE              )
    OF HAZEL CREST POLICE            )
11  OFFICERS,                        )
              Defendants.            )
12
13       The deposition of OFFICER DERRICK A.
14  CHAMBLISS, Star No. 78, called for examination
15  pursuant to the Rules of Civil Procedure for
16  the United States District Courts pertaining
17  to the taking of depositions, taken before
18  Dawn C. Evers, a notary public within and for
19  the County of Cook and State of Illinois, at
20  3700 175th Street, Country Club Hills, Illinois,
21  on the 22nd day of May, 2015, at the hour of
22  9:30 o'clock a.m.
23  Dawn C. Evers
24  License No.: 084-004459

                                              1

1   STATE OF ILLINOIS     )
2                         ) SS:
3   COUNTY OF C O O K      )
4
5     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
6         COUNTY DEPARTMENT - LAW DIVISION
7
8   CLARENCE BOWERS,            )
9            Plaintiff,         )
10      vs.                     ) No. 14 CV 06889
11  VILLAGE OF CRESTWOOD,       )
12  et al.,                     )
13           Defendants.        )
14
15       The discovery deposition of DERRICK A.
16  CHAMBLISS, Star No. 78, taken in the
17  above-entitled cause, before Dawn C. Evers,
18  a Notary Public of Cook County, Illinois,
19  on May 22, 2015 at 3700 175th Place, Country
20  Club Hills, Illinois, pursuant to notice.
21
22
23  Dawn C. Evers
24  License No.: 084-004459

                                              2

1   APPEARANCES:
2
3   ED FOX & ASSOCIATES
4   BY:  MR. EDWARD M. FOX
5   300 West Adams Street
6   Suite 330
7   Chicago, Illinois  60606
8   (312) 345-8877
9   efox@efox-law.com
10       Representing the Plaintiff;
11
12  STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
13  BY:  MS. ANNA G. O'CONNOR
14  50 West Washington Street
15  Chicago, Illinois  60602
16  (312) 603-6665
17  anna.oconnor@cookcountyil.gov
18       Representing the Defendants
19       O'Neil, Moriarty, Meehan, Lee,
20       May and Norton;
21
22
23
24

                                              3

1   APPEARANCES:  (Continued)
2
3        PURCELL & WARDROPE, CHARTERED
4        BY:  MS. EMILY E. SCHMIDT
5        10 South LaSalle Street
6        Suite 1200
7        Chicago, Illinois  60603
8        (312) 427-3900
9        ees@pw-law.com
10            Representing the Village of
11            Crestwood;
12
13       DEL GALDO LAW GROUP, LLC
14       BY:  MR. K. AUSTIN ZIMMER
15       1441 South Harlem Avenue
16       Berwyn, Illinois  60402
17       (708) 222-7000
18       www.dlglawgroup.com
19            Representing Officer Derrick A.
20            Chambliss.
21
22
23
24

                                              4



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

                                            1..4

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| OFF. DERRICK A. CHAMBLISS | |
| By Mr. Fox (Exam) | 7 |
| By Ms. Schmidt (Exam) | 82 |
| By Ms. O'Connor (Exam) | 86 |
| By Mr. Fox (Further Exam) | 88 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| Chambliss Deposition Exhibit | |
| Exhibit No. 1 | 6 |
| Exhibit No. 2 | 6 |

5

---

1          (whereupon, Chambliss Deposition
2          Exhibit Nos. 1 and 2 were
3          marked for identification.)

4

5          (whereupon, the witness was duly
6          sworn.)

7

8          OFFICER DERRICK A. CHAMBLISS,
9  having been first duly sworn, was examined and
10 testified as follows:

11

12     MR. FOX:  Could you state your name and
13 spell your name for the record?
14     THE WITNESS:  Officer Chambliss.
15 C-h-a-m-b-l-i-s-s.  Star No. 78.
16     MR. FOX:  And your first name is Derrick?
17     THE WITNESS:  Correct.
18     MR. FOX:  And for the record, this is
19 the deposition of Officer Chambliss and
20 we've agreed that this deposition could
21 be used for both the Marvin Jones case and
22 the Clarence Bowers case.  Is that correct
23 everybody?
24     MS. O'CONNOR:  Yes.

6

---

1     MS. SCHNIDT:  Yes.
2     MR. ZIMMER:  Yes.
3     MR. FOX:  Okay.  And also, for the
4 record, this deposition is being taken
5 pursuant to notice and pursuant to all
6 the applicable rules of the Northern District
7 of Illinois and the Rules of Civil Procedure.

8

9          EXAMINATION
10 BY MR. FOX:
11     Q.  Have you ever had your deposition
12 taken before?
13     A.  For this case, no.
14     Q.  For any case?
15     A.  Yes.
16     Q.  And when was the last time?
17     A.  2012.
18     Q.  What kind of case was that?
19     A.  It was a -- umm -- assist ambulance
20 case dealing with a mental subject.
21     Q.  And have you ever had -- have you
22 had your deposition taken at any other
23 proceedings?
24     A.  No.

7

---

1     Q.  How long have you been a police
2 officer?
3     A.  Approximately seven years.
4     Q.  And so since you had your
5 deposition taken once you have a general
6 idea what I'm going to do, but I'm going
7 to ask you a series of questions.  Just
8 make sure you understand my question and
9 that you've heard it.  Because if you don't
10 understand it or you don't hear it just
11 let me know and I'll repeat or rephrase it,
12 okay?
13     A.  Yes, sir.
14     Q.  And as we've been doing, sir, try
15 to wait for me to finish my question before
16 you answer.  Likewise, I'll wait for you
17 to finish your answer before I ask the
18 next question so we don't talk over each
19 other.
20     A.  Okay.
21     Q.  Answer out loud like you've been
22 doing.  Nods of the head don't work well and
23 uh-huhs and uh-uhs are equally difficult for
24 the court reporter to get down accurately.

8

---

1    A.   Okay.
2    Q.   And if you want to take a break
3  for any reason, and we're not in the middle
4  of a question, just let us know, okay?
5    A.   Yes, sir.
6    Q.   All right.  And for the seven years
7  you've been a police officer for Hazel Crest
8  Police Department?
9    A.   About six-and-a-half years with
10  Hazel Crest Police Department.
11    Q.   And have you been a police officer
12  for any other agencies?
13    A.   Currently employed with Country Club
14  Hills Police Department.
15    Q.   And when did you become employed with
16  Country Club Hills?
17    A.   November of 2014.
18    Q.   And why did you leave Hazel Crest?
19    A.   Promotion.
20    Q.   Before Hazel Crest were you a police
21  officer anywhere?
22    A.   No.
23    Q.   Okay.  Did you ever do any security
24  work before that?

9

1    A.   Yes.
2    Q.   What kind of security work?
3    A.   Corporate security.
4    Q.   Okay.  For who?
5    A.   ABM Security.
6    Q.   And what's your highest level of
7  education?
8    A.   Bachelor's in Criminal Justice.
9    Q.   Where and when did you get that
10  degree?
11    A.   Governor State University, 2014.
12    Q.   Have you ever been sued prior to
13  this for anything in connection with your
14  work?
15    A.   Yes.
16    Q.   And how many times?
17    A.   Twice.
18    Q.   Okay.  Were those cases in
19  Federal Court?
20    A.   No.
21    Q.   Do you know were they in State Court?
22    A.   Yes.
23    Q.   Do you know the names of those cases?
24    A.   I can't recall.

10

1    Q.   All right.  What was the outcome of
2  those cases?  Do you know?
3    A.   I never had depositions for them so
4  I wouldn't know.
5    Q.   All right.  In preparation for the
6  deposition today did you review anything?
7    A.   Yes.
8    Q.   And what did you review?
9    A.   My preliminary police report.
10    Q.   Anything else?
11    A.   Interrogatories.
12    Q.   Okay.  Did you review any police
13  reports that were done by the Crestwood Police
14  Department?
15    A.   No, I did not.
16    Q.   Have you ever reviewed police reports
17  that were done by the Crestwood Police
18  Department?
19    MR. ZIMMER:  In connection with this case?
20    MR. FOX:  Correct.
21    THE WITNESS:  No.
22  BY MR. FOX:
23    Q.   And then in preparation for this
24  deposition have you talked with any other

11

1  police officers about this case outside
2  the presence of your attorney?
3    A.   No.
4    Q.   Okay.  Have you talked to any
5  police officers outside the presence of
6  your attorney about this case within the
7  past month?
8    A.   No.
9    Q.   Back in July 26th of 2014 what
10  was your -- what was your assignment with
11  Hazel Crest?
12    A.   I was a tact officer.
13    Q.   And what is a tact officer?
14    A.   We wear plain clothes and do undercover
15  investigations.
16    Q.   And how long had you been a tact
17  officer as of that time?
18    A.   Approximately one year.
19    Q.   And when you worked as a tact officer
20  were you in plain clothes all the time?
21    A.   Most of the time.
22    Q.   Did you use a plain vehicle or an
23  unmarked vehicle?
24    A.   Yes.

12

1    Q.   Before July 26th, 2014 did you know
2  who Marvin Jones was?
3    A.   Yes, I did.
4    Q.   And how did you know him?
5    A.   Prior contacts.
6    Q.   What kind of contacts?
7    A.   Investigatory stops, traffic stops,
8  service calls at his residence.
9    Q.   Had you ever arrested him before
10 July 26th?
11   A.   Yes.
12   Q.   For what?
13   A.   Possibly domestic battery.  Suspended
14 license.
15   Q.   How many contacts did you have with
16 him before July 26th, 2014?
17   A.   I would say more than ten.
18   Q.   And then -- and then you had these
19 prior contacts that you had with him, did
20 you ever -- was he ever uncooperative with
21 you?
22   A.   No.
23   Q.   Did he ever use any foul language
24 towards you?

13

1    A.   No.
2    Q.   Had you ever testified in
3  connection with any case you arrested him
4  for before July 26th?
5    A.   I can't recall if I did or not.
6    Q.   Now moving to Clarence Bowers
7  for a minute.  Did you know him before
8  July 26th?
9    A.   Yes.
10   Q.   And how did you know him?
11   A.   Traffic stops.  Investigatory stops.
12   Q.   Had you ever arrested Clarence Bowers
13 before July 26th?
14   A.   I don't believe I did.
15   Q.   At any time -- well, how many stops
16 -- let me withdraw that and rephrase it.
17        How many prior contacts did you have
18 with him before July 26th?
19   A.   Maybe at or around five contacts.
20   Q.   In any of these prior contacts that
21 you had with him was he ever uncooperative
22 with you?
23   A.   Not that I could recall.
24   Q.   Did he use any foul language towards

14

1  you?
2    A.   No.
3    Q.   Before July 26th, 2014 did you
4  ever suspect Clarence Bowers to be involved
5  in any criminal activity that you were
6  investigating?
7    A.   Yes.
8    Q.   Can you describe what that was?
9    A.   Yes.  I had prior intelligence
10 from the Homewood Police Department that
11 he had -- he may have been involved in a
12 phone robbery at the AT&T store on Halsted.  One
13 of the license plates that came back to one
14 of the vehicles leaving the scene was
15 registered to him.
16   Q.   I'm sorry, which police department
17 did you say that was?
18   A.   Homewood Police Department.
19   Q.   Do you know if he was ever arrested
20 in connection with that robbery?
21   A.   I can't recall.
22   Q.   Did you do -- well, how did it come
23 about that you got that prior intelligence?
24   A.   I had a lot of contacts with the

15

1  Homewood Police Department and their
2  Investigations Team and whenever they
3  would have any kind of information that's
4  coming from Hazel Crest they'll relate it
5  to me and vice versa.
6    Q.   And then other than this incident
7  that you've just described, before July 26th,
8  had you known him to be a suspect in any other
9  criminal activity?
10   A.   Yes.
11   Q.   What was that?
12   A.   Narcotics.
13   Q.   Can you describe what that was
14 about?
15   A.   Markham Police Department they
16 advised me that he had been arrested prior
17 for PCS and that was their Tact Unit as
18 well.
19   Q.   Do you recall what the controlled
20 substance was that he was arrested for?
21   A.   If I'm not mistaken it was cocaine.
22   Q.   Do you know what was the outcome of
23 that arrest?
24   A.   I do not know.

16

```
 1    Q.  Okay.  Any other criminal activity,
 2  before July 26th of 2014 that you knew he was
 3  suspected of committing?
 4    A.  No.
 5    Q.  And then the same question with
 6  regard to Marvin Jones.  Before July 26th
 7  had you known him to be a suspect in any
 8  criminal activity that you were not directly
 9  involved in?
10    A.  Yes.
11    Q.  And what was that?
12    A.  A phone store robbery, Woodridge Police
13  Department.
14    Q.  And when was that?
15    A.  I can't recall the exact date.
16    Q.  Can you recall the year?
17    A.  Possibly 2013.
18    Q.  Anything else?
19    A.  No.
20    Q.  Do you know if he was ever arrested
21  in connection with the Woodridge phone store
22  robbery?
23    A.  Yes, he was.
24    Q.  And do you know what the outcome of
```
                                        17

```
 1  that was?
 2    A.  I think he was given probation in
 3  that case.
 4    Q.  And before July 26th, 2014, did
 5  you know Marvin Jones from any other source
 6  or -- from any other source other than what
 7  you already testified to?
 8    A.  No.
 9    Q.  And same question for Clarence Bowers.
10  Before July 26th did you know him from any
11  other source other than what you've already
12  testified to?
13    A.  No.
14    Q.  Now going to that date, sir,
15  July 26th.  You became aware that a robbery
16  of an AT&T store took place?
17    A.  Yes.
18    Q.  And how did you become aware?
19    A.  Sergeant Mitchell of the Hazel Crest
20  Police Department notified me.
21    Q.  And what did he say when he notified
22  you?
23    A.  He asked me would I be interested in
24  assisting the Crestwood Police Department in
```
                                        18

```
 1  a robbery that just occurred.
 2    Q.  And I take it that you indicated
 3  that you would be interested?
 4    A.  Correct.
 5    Q.  Okay.  And then did Sergeant Mitchell
 6  give you -- during this -- was this a phone
 7  call that you had with Sergeant Mitchell?
 8    A.  No, he actually told me to meet
 9  him.  I was on duty at the time.  He told
10  me to meet him at the station.  So it was
11  a face-to-face interaction.
12    Q.  All right.  So when you met with
13  him at the station what time of day was it
14  roughly?
15    A.  It had to be around noon.
16    Q.  So when you met with him what
17  information did he give you?
18    A.  He said he was contacted by
19  Crestwood police.  I can't recall what
20  officer contacted him, but he said that
21  they had a phone store robbery at the AT&T
22  store on Cicero and one of the subjects
23  that they caught they had him in custody
24  and he said that the guys who were involved
```
                                        19

```
 1  with him were from Hazel Crest.
 2    Q.  So this Sergeant Mitchell that
 3  you just mentioned was he in the
 4  Hazel Crest department?
 5    A.  Yes.
 6    Q.  Okay.  And then when you had this
 7  meeting with Sergeant Mitchell, sir, did
 8  he indicate the names of any of these other
 9  guys that were thought to be involved?
10    A.  No.
11    Q.  Did he indicate any descriptions?
12    A.  No.
13    Q.  Did he give you any other information
14  other than what you've already testified to?
15    A.  No.
16    Q.  So after you got that information
17  from Sergeant Mitchell what was the next
18  thing you did in connection with the robbery?
19    A.  Based on my prior intelligence
20  I printed out photos, colored images, from
21  the Secretary of State database before I
22  went to the Crestwood Police Department to
23  meet with their officers and detectives in
24  reference to this case.
```
                                        20

1    Q.   So the prior -- but the photos
2  that you printed out you did this at the
3  Hazel Crest Police Station?
4    A.   Correct.
5    Q.   And what was your source for the
6  photographs that you printed out?
7    A.   Secretary of State.
8    Q.   Drivers license stuff?
9    A.   Yes.
10   Q.   And then whose photos did you print
11 out?
12   A.   Clarence Bowers.  Marvin Jones.  Chucky
13 Dennis.  There's two more photos.  I can't
14 recall the guy's names that were involved
15 with the robberies at the time, but it was
16 about five photos I printed out total.
17   Q.   And why did you print out the photos
18 of the five?  Well, let's go through each one.
19 Why did you print out Chucky Dennis's photo?
20   A.   Because I had intel from Markham
21 and Homewood that he may have been involved
22 in robberies.
23   Q.   Okay.  Did you have intel that he
24 was involved in the specific robbery that --

                                              21

1  on July 26th?
2    A.   No.
3    Q.   And then Clarence Bowers.  Why did
4  you print out his photo?
5    A.   Prior intelligence from Homewood Police
6  Department that he may have been involved in
7  their phone store robbery.
8    Q.   And then why did you print out
9  Marvin Jones?
10   A.   I had intelligence on him that he
11 had in fact committed a phone store robbery
12 at Woodridge.
13   Q.   And then why did you print out the
14 photos of the two more people that you don't
15 recall their names?
16   A.   They were residents of Hazel Crest,
17 but I had prior intelligence from the
18 Homewood Police Department that they may
19 have been involved in the phone store
20 robberies on Halsted.
21   Q.   And were all these guys that you
22 printed out were they all male black?
23   A.   Yes, they were.
24   Q.   And then can you give me the

                                              22

1  approximate age of Chucky Dennis?
2    A.   Male black.  Early to mid 30s.
3    Q.   And then can you give me an
4  approximate height and weight?
5    A.   About 6 foot 1.  240.  240 pounds.
6    Q.   Facial hair?
7    A.   No.
8    Q.   Any particular hairstyle?
9    A.   Dreadlocks.
10   Q.   Do you know if they were short or
11 long dreadlocks?
12   A.   I would say medium length.
13   Q.   And can you recall anything else
14 about Chucky Dennis that stands out?
15   A.   No.
16   Q.   Any tattoos that stand out that you
17 can recall?
18   A.   I think he has tattoos in his face.
19   Q.   And then you know what Clarence Bowers
20 looks like from your prior contacts with him,
21 correct?
22   A.   Correct.
23   Q.   Okay.  And what do you recall of his
24 height and weight to be roughly?

                                              23

1    A.   About 6 foot 1.  185.
2    Q.   Facial hair?
3    A.   Maybe a mustache and beard.
4    Q.   And then hairstyle?
5    A.   Short.
6    Q.   Do you recall if he had any
7  prominent tattoos?
8    A.   No.
9    Q.   Then Marvin Jones, do you recall his
10 height and weight?
11   A.   About 5'6.  165, 170 pounds.
12 Dreadlocks.
13   Q.   Do you recall if they were long or
14 short?
15   A.   Medium length.
16   Q.   And then the two other guys.  Let's
17 just call them A and B.
18   A.   I actually recall one of the names
19 now.
20   Q.   Okay.  What is it?
21   A.   Ernest Booth.
22   Q.   Can you spell the last name?
23   A.   B-o-o-t-h.
24   Q.   And what was his height and weight

                                              24

1  roughly?
2      A.   5'6.  160 pounds.  Dreadlocks.
3      Q.   Short or long?
4      A.   Medium.
5      Q.   And then any other facial hair?
6      A.   Beard.
7      Q.   Can you remember anything else that
8  stands out about his appearance?
9      A.   No.
10     Q.   Any other fellow whose name you
11  don't recall?  Do you remember his height and
12  weight roughly?
13     A.   Because I can't recall the name, I
14  can't recall the description.
15     Q.   Okay.  Fair to say he's a male
16  black?
17     A.   Oh, yeah.
18     Q.   And roughly his age.
19     A.   At or around 30 years of age.
20     Q.   And then I didn't ask you that
21  question for Ernest Booth.  What was his
22  age roughly?
23     A.   Late 20s.
24     Q.   And this guy Chucky Dennis who

25

1  you already mentioned.  Did you know him
2  to have been arrested for robberies in the
3  past?
4      A.   Yes, I did.
5      Q.   And do you know if he had been
6  convicted of robberies in the past?
7      A.   I'm not sure about the conviction,
8  but I know he had several arrests.
9      Q.   Okay, and then the same question
10  for Ernest Booth.  Do you know if he had
11  been convicted for any robberies in the
12  past?
13     A.   No.
14     Q.   Okay.  What was his arrest for to
15  the extent that you can recall?
16     A.   I think it was drugs and burglary.
17     Q.   I know you don't remember the guy's
18  name.  Do you remember anything -- anything
19  about his rap sheet for the guy's name that
20  you don't remember?
21     A.   No.
22     Q.   And was there any other reason
23  that you printed out those five photographs
24  other than what you've already testified

26

1  to?
2      A.   No.
3      Q.   I think I asked you this, but I
4  forgot.  Did you get the names of anybody
5  before you left the Hazel Crest Police
6  Department?  Let me withdraw it and ask
7  it again.
8          Did you get the names of any people
9  that were suspects from Sergeant Mitchell?
10     A.   One second, please.
11     Q.   Okay.
12     A.   I did in fact get information and
13  I can recall the fifth guy now.
14     Q.   Okay.
15     A.   It's going to be -- umm -- they said
16  a guy name Chuck or Charles.
17     Q.   The fifth guy that you couldn't
18  remember was Chuck or Charles?
19     A.   Yes.  The fifth guy I printed out
20  his name was Charles Starks and he's also
21  a resident of Hazel Crest.
22     Q.   And now that you remember his name,
23  do you remember anything about his height and
24  weight?

27

1      A.   About 5'6.  215 pounds.
2      Q.   So he's a pretty heavyset guy?
3      A.   Yes.
4      Q.   And then do you remember if he had
5  dreadlocks?
6      A.   Short hair.
7      Q.   Facial hair?
8      A.   No.
9      Q.   Do you remember anything -- any
10  other unusual features about him?
11     A.   No.
12     Q.   And do you remember anything about
13  his prior arrest record?
14     A.   Just drugs.
15     Q.   Okay.  Getting back to my other
16  question.  Did Sergeant Mitchell give you
17  the names of any suspects before you left
18  your meeting with him?
19     A.   Just Chucky or Charles.
20     Q.   Did you get any more information
21  from Sergeant Mitchell during that initial
22  meeting you've described other than what
23  you already testified to?
24     A.   No.

28

1    Q.   Once you got that information
2 from him what was the next thing you did
3 in connection with the investigation?
4    A.   He gave me authorization to go
5 and assist Crestwood Police Department.  At
6 that point I proceeded to take a police
7 vehicle to Crestwood.
8    Q.   What time did you get to Crestwood,
9 roughly?
10   A.   I can't recall.
11   Q.   Okay.  So once you got to Crestwood
12 was there a guy already in custody in connection
13 with the robbery?
14   A.   Yes.
15   Q.   And his name was Demetrius Merrill?
16   A.   I can't remember the first name, but
17 I know Merrill was the last name.
18   Q.   When you got to the Crestwood Police
19 Station what did you do?
20   A.   If I remember correctly I did not
21 speak to him right away because they were
22 trying to locate a gun.  So I think I
23 assisted them on the search for that
24 handgun.

29

1    Q.   So you actually went out to where
2 the AT&T was?
3    A.   Correct.
4    Q.   And if I remember from the reports
5 there was some forested area around that
6 area; is that correct?
7    A.   Yes.
8    Q.   And you went and searched there for
9 a gun?
10   A.   Yes.
11   Q.   Did you find the gun or did somebody
12 else?
13   A.   Somebody else found it.
14   Q.   While you were in that area did you
15 talk with any witnesses?
16   A.   No.
17   Q.   Did you talk with any police officers
18 about suspects?
19   A.   I did.  I can't remember the name
20 of the officer I spoke to, but he did in
21 fact let me know that they had one guy in
22 custody.
23   Q.   Did the officer that you spoke to
24 give you any information about other suspects?

30

1    A.   No.
2    Q.   And would it be fair to say you
3 didn't get any information about other
4 suspects while you were at the scene of
5 the robbery or near the scene of the
6 robbery?
7    A.   Correct.
8    Q.   And you did not talk to any witnesses
9 there; is that correct?
10   A.   That is correct.
11   Q.   Okay.  Did you overhear any witnesses
12 talking there?
13   A.   No.
14   Q.   And so from there -- from the scene
15 of the robbery where did you go?
16   A.   To the Crestwood Police Station.
17   Q.   So as of the time you got back
18 to the Crestwood Police Station, is it
19 correct that you did not have the names
20 of any suspects in the robbery other than
21 the offender that was already in custody?
22   A.   Correct.
23   Q.   And is it also accurate that you
24 did not have descriptions of any suspects

31

1 in the robbery other than maybe perhaps
2 the offender that was already captured?
3    A.   That is correct.
4    Q.   Okay.  So when you got back to
5 Crestwood, sir, what did you do?
6    A.   I made sure they had already
7 Mirandized the person they had in custody
8 and when I discovered that he was a minor
9 I made sure they had a juvenile officer
10 present while I asked him some questions
11 regarding the robbery.
12   Q.   Okay.  What was the juvenile officer's
13 name?
14   A.   I can't recall.
15   Q.   And so you went and talked to the
16 -- this guy Merrill; is that correct?
17   A.   Correct.
18   Q.   And where was he when you went to
19 talk to him?
20   A.   He was -- he wasn't in a cell.  I
21 think he was like in an interview room.
22   Q.   And did you say the juvenile officer
23 was in the room with you while you were talking
24 to him?

32

1   A.   Yes, he was.
2   Q.   Was his mother there?
3   A.   I don't recall his mom being there.
4   Q.   All right.  Was anybody else there
5   when you were talking to him other than
6   you and this juvenile officer?
7   A.   Officer Watson of the Hazel Crest
8   Police Department.
9   Q.   Did he join you to either the
10  scene?  Did he join you to the scene of
11  the robbery?
12  A.   Yes, he did.
13  Q.   Did he join you originally when
14  you first talked to Sergeant Mitchell about
15  this?
16  A.   Yes.  We were working a covert
17  detail that day together.  He wasn't my
18  permanent partner, but because he was with
19  me he assisted as well.
20  Q.   Did Officer Watson indicate to
21  you that he knew any of these five persons
22  whose photos you obtained?
23  A.   He didn't have the intelligence I
24  had, no.

33

1   Q.   Okay.  So he didn't have anything
2   to add about these five persons that you already
3   testified to?
4   A.   No.
5   Q.   Do you know if Officer Watson also
6   accompanied you to the scene of the robbery
7   when you went to search for the gun?
8   A.   Yes.
9   Q.   Do you know if he obtained any
10  information about other suspects?
11  A.   No, I wouldn't know.
12  Q.   Do you know if he talked to any
13  witnesses at the scene?
14  A.   No.
15  Q.   Did he -- did you ride with
16  Officer Watson from the AT&T -- the area
17  of the AT&T store back to the Crestwood
18  station?
19  A.   Yes.
20  Q.   Okay.  Did Officer Watson inform
21  you on the way back to the Crestwood Police
22  Station that he had names of suspects in the
23  AT&T robbery?
24  A.   No.

34

1   Q.   Did he inform you of whether or
2   not he had descriptions of any other suspects
3   in the AT&T robbery?
4   A.   No.
5   Q.   I'm going to direct your attention
6   back to the room where you were talking
7   with Merrill.  You had indicated that
8   the other folks in there were a juvenile
9   officer from Crestwood and this Officer Watson;
10  is that correct?
11  A.   Correct.
12  Q.   So can you describe the conversation
13  with the offender?
14  A.   Yes.  I asked him what happened at
15  the AT&T store.  He went on to advise me in
16  detail about his involvement and who else
17  was involved in this case with him.
18  Q.   So what did he say about who else
19  was involved in the case?
20  A.   He said he had met these guys
21  like a week prior and he said this guy
22  Chucky, I can't recall all the names
23  that he gave, was like the mastermind behind
24  it.

35

1       He also stated that they were
2   there at the scene with him.  The guy
3   who supposed to -- umm -- had went into
4   the store with him -- umm -- left him
5   inside the store when the police came and
6   he said they left him there.
7   Q.   Did he say how many other people
8   were involved?
9   A.   He said it was one who was
10  supposed to go in with him and there was
11  two more that was supposed to be parked
12  across the street in a car as lookouts.
13  Q.   So I'm getting a total of four
14  people including himself?
15  A.   A total of four including himself,
16  yes.
17  Q.   And then did he give you the name
18  of the person who was supposed to go in
19  with him?
20  A.   He did give me the name.  I can't
21  recall the name.
22  Q.   Do you recall if it was either
23  Marvin Jones or Clarence Bowers?
24  A.   After he looked at the images we

36

1  discovered that it was Marvin Jones.
2      Q.   Did he not give you the name
3  Marvin Jones?
4      A.   He did not.
5      Q.   Do you recall if he gave you a
6  name Ryan?
7      A.   I don't recall.
8      Q.   Did he give -- before you showed
9  him -- did you have the conversation that
10  you just described with him before you showed
11  him pictures of anybody?
12      A.   Yes.
13      Q.   You said he gave you the name
14  Chucky; is that correct?
15      A.   Correct.
16      Q.   Before he gave you any pictures can
17  you recall any other names that he gave you,
18  if any?
19      A.   Could you rephrase?
20      Q.   Sure.  Before you showed him -- you
21  said at some point you showed him pictures,
22  correct?
23      A.   Yes.
24      Q.   Before that time that you showed

37

1  him a picture he gave you the name
2  Chucky?
3      A.   Yes.
4      Q.   Okay.  Did he give you any other
5  names of people before he showed you the
6  picture?  Before you showed him the pictures?
7      A.   He did in fact give me some names,
8  but I just can't recall.
9      Q.   It was not Marvin Jones; is that
10  correct?
11      A.   He did not give me their real names.
12      Q.   Okay.
13      A.   He gave me some kind of street name
14  that he said they gave him.
15      Q.   Did he give you the name Clarence
16  Bowers?
17      A.   No.
18      Q.   Did he give you any -- do you
19  remember any street names that he gave you
20  of anybody?
21      A.   Just Chucky.  Or Chuckmo.  Chuckmo.
22      Q.   That's one name?  One word?
23      A.   That's one word.
24      Q.   So like C-h-u-c-k-m-o?

38

1      A.   Correct.
2      Q.   And then before you showed him
3  any pictures did you ask him for descriptions
4  of the people that were involved in this
5  robbery?
6      A.   I did.
7      Q.   And can you tell me the description
8  that he gave you before you showed him
9  pictures?
10      A.   I can't recall the descriptions
11  at this time.
12      Q.   Were you taking notes of your
13  interview with Merrill?
14      A.   I was.
15      Q.   Do you still have your notes?
16      A.   More likely not.
17      Q.   Did you ever -- when you say more
18  likely not, what do you mean by that?
19      A.   I usually destroy information like
20  that.  I don't want anybody to get ahold of
21  anyone's information -- personal information.
22  So once the case is done I'll usually destroy
23  any and all information that's on paper.
24      Q.   Did you write any police reports,

39

1  any sort of police reports, supplemental
2  report, or any memo that incorporated the
3  conversation that you had with Merrill?
4      A.   I believe so.
5      Q.   There's a report in front of you
6  which has your -- I think -- what exhibit
7  number is on there?
8      A.   Exhibit 2.
9      Q.   2.
10      A.   2.
11      Q.   That report there, is that one that
12  you signed?
13      A.   Yes.
14      Q.   Okay, this report.  Well, read it
15  to yourself and I'll ask you a couple of
16  questions about it.
17      A.   Okay.  Go ahead.
18      Q.   So would it be fair to say that
19  this report does not document the conversation
20  you had with Merrill?
21      A.   That is correct.
22      Q.   Okay.  So you think you have another
23  report that does document the conversation?
24      A.   It might have just been my notes,

40

1 but I remember writing it down. I would
2 have to check with the Hazel Crest Police
3 Department to see if anyone investigated
4 or supplemental reports were done in this
5 case.
6     Q.    And how would you go about doing
7 that?
8     A.    Just going to Hazel Crest, pulling
9 up this report number, and seeing if they
10 have any other letters attached to this case
11 report.
12    Q.    Before you showed Merrill any
13 of the photographs that you had brought, do
14 you recall any other conversation other
15 than what you've testified to that you
16 had with him?
17    A.    No.
18    Q.    Okay. So after he gave you the
19 conversation you testified to did you
20 retrieve the pictures that you had?
21    A.    Yes.
22    Q.    And where had you -- where did you
23 have them in your pocket or --
24    A.    Folder.

41

1     Q.    I'm sorry?
2     A.    I had them in a folder.
3     Q.    Okay. And did you have the folder
4 with you while you were talking to him?
5     A.    Yes.
6     Q.    Okay. So I take it at that point
7 you showed him the pictures; is that correct?
8     A.    Correct.
9     Q.    And then tell me what happened. Did
10 you show them -- when you showed him the
11 pictures did you show them altogether or did
12 you show him the pictures one by one?
13    A.    What I usually do is I fold the
14 picture in half so you can't see the
15 information of the person attached to the
16 photo and then I showed him one by one.
17    Q.    Okay. You said what I usually do,
18 do you know if you did that in this case?
19    A.    Yes, I did that in this case.
20    Q.    So if I understand this correctly
21 -- because I don't -- I can't picture the way
22 the photos looked that you showed him. On
23 one half of the photo it would have the typed
24 name and other identifying information about

42

1 the person and the other half would just
2 have the photograph?
3     A.    Well, there's one -- one sheet.
4     Q.    Right.
5     A.    At the top is the actual image and
6 at the bottom is the information. You know
7 address, the person's name, that's usually
8 on a license. So I fold it in half to just
9 show the actual photo image so they can't
10 really see the personal information at the
11 bottom of the sheet.
12    Q.    And the photos that you showed
13 him are these facial shots or full body
14 shots?
15    A.    Facial.
16    Q.    All right. And you said you showed
17 him one by one?
18    A.    Yes, I did.
19    Q.    And then when you showed it to him
20 do you remember the first one you showed him?
21    A.    I don't recall what order I showed
22 him.
23    Q.    All right. So what happened when you
24 showed him the photos?

43

1     A.    When I showed him the photo of
2 Marvin Jones he identified him as one of
3 the subjects who -- the subject that was
4 supposed to go into the store with him.
5     Q.    Did he say anything else about
6 any of the other photos?
7     A.    Yes. I showed him the picture
8 of Clarence Bowers and he identified him
9 as the mastermind of the operation. He
10 advised me that he was the lookout. He
11 orchestrated the entire robbery and that
12 he left the subject Merrill at the store.
13    Q.    And so when you were showing the
14 photos to the -- umm -- Merrill, Watson was
15 in the room with you as well as the juvenile
16 officer from Crestwood?
17    A.    Correct.
18    Q.    During and/or after you showed
19 Merrill the photos, sir, did you have any
20 other conversation about the robbery and
21 the persons who were doing the robbery
22 with him?
23    A.    You know I asked him if in fact
24 he had been involved in any others since

44

1 we had a open line of communication, but
2 he told me that he had not been involved
3 in any others outside of the Crestwood
4 AT&T store.
5  Q.  And do you still have the photos
6 that you showed this fellow?
7  A.  No.
8  Q.  Did you put them into a folder at
9 Hazel Crest?
10  A.  No, I destroyed them.
11  Q.  Okay.  Would I be able to --
12 would you be able to access those photos
13 by going onto the Secretary of State
14 website?
15  A.  Yes.
16  Q.  And why did you destroy the
17 photos after you showed him to -- after
18 you showed them to Merrill?
19  A.  So nobody else can get ahold
20 of anybody's information.  Those photos
21 have addresses, names, and with current
22 identity theft I don't want anybody getting
23 ahold of that.
24  Q.  The two persons that he identified,

1 Clarence Bowers and Marvin Jones, their
2 information would be placed in the police
3 reports, correct, their identifying
4 information?
5  A.  Correct.
6  Q.  So in connection with that, why
7 would you throw out -- why would you get
8 rid of those photos if their identifying
9 information would be put into the police
10 reports anyway?
11  A.  Well, the police reports are kind
12 of confidential.  The Secretary of State
13 photos they get moved around and that
14 information can be anywhere.
15  Q.  Is there any reason why you can't
16 keep them with -- the photos with the police
17 reports and keep them confidential?
18  A.  Because we can access them through
19 the Secretary of State database.
20  Q.  Did he give you any other information
21 about the robbery that you haven't already
22 testified to?
23  A.  He said that when he went in and
24 took his gun out and pointed it at one of

1 the employees he said the police was there
2 and they shot at him.  At which point we
3 later discovered that it was just a citizen
4 who had a Concealed Carry Permit.
5  Q.  Did he indicate to you what kind
6 of car he drove or arrived in to the store?
7  A.  He didn't.
8  Q.  Did he indicate what kind of car
9 the two lookouts were in?
10  A.  I think he described it, but I can't
11 remember.
12  Q.  Did he indicate where he knew
13 these other guys from that were involved
14 in the robbery with him?
15  A.  Yes.
16  Q.  And what did he say about that?
17  A.  He said they were from Hazel Crest
18 and Markham.
19  Q.  Did he say how he knew them?
20  A.  He said he met them a week prior
21 to this incident through a girlfriend.
22  Q.  I'm sorry, through a girlfriend?
23  A.  His girlfriend or one of their
24 girlfriends.  Through a female subject.

1  Q.  Did he say how long?  When he had
2 met them how long ago it was?
3  A.  About a week prior to this incident.
4  Q.  And when you were talking to him
5 were you getting the sense that or did you
6 form any opinions about whether he was
7 being truthful with you about everything
8 he was talking about?
9  A.  No.
10  Q.  And why do you say that?
11  A.  When I'm doing my interviews and
12 my investigations I try to be unbiased.  You
13 know I take the information they give me and
14 I see if I could take it to the next level
15 or not.  With the information he gave me
16 at that time I felt like it was enough to
17 at least do a follow-up investigation.
18  Q.  What do you mean by that?
19  A.  What I mean by that is, when he gave
20 me the information he positively identified
21 these subjects from photos.  Because I had
22 prior knowledge of them being involved in
23 other incidents -- umm -- I felt like there
24 was enough to bring them in for questioning.

1    Q.   Now did you know Clarence Bowers
2  to ever be known by the name of Chucky or
3  Chuckmo?
4    A.   No.
5    Q.   And I think you said, and correct
6  me if I'm wrong, before that he gave another
7  nickname for the other -- another -- for the
8  guy who was supposed to wait outside for him.
9    A.   Um-hmm.
10   Q.   Is that correct?
11   A.   Yes.
12   Q.   And you said you didn't remember
13 that nickname; is that correct?
14   A.   Correct.
15   Q.   Do you remember if that nickname
16 was associated with Marvin Jones?  Whatever
17 that nickname was.
18   A.   Yes.
19   Q.   And as you sit here you still don't
20 remember the nickname?
21   A.   I do not.
22   Q.   As you sit here now what nicknames
23 are associated with Marvin Jones that you can
24 remember, if any?

49

1    A.   I don't remember any.
2    Q.   Do you remember any nicknames that
3  are associated with Clarence Bowers?
4    A.   Are you asking from prior intelligence
5  or from subject Merrill?
6    Q.   Let's do it both ways.  From prior
7  intelligence, did you know of any nicknames
8  that were associated with Clarence Bowers?
9    A.   The street name is CB.
10   Q.   And then from -- did Merrill --
11 and what did Merrill tell you about his
12 nickname?
13   A.   He said that's Chuckmo.
14   Q.   And was that the first time that
15 you had heard the name -- the nickname
16 Chuckmo associated with Clarence Bowers?
17   A.   Yes.
18   Q.   Now you said one of the fellows
19 whose name -- whose photo you showed Merrill
20 his name was Chucky something, do you recall
21 that?
22   A.   Yes.
23   Q.   Okay.  And do you recall any nicknames
24 that he went by?

50

1    A.   No.
2    Q.   And then the same question for
3  Ernest Booth.  Do you remember any nicknames
4  that that fellow went by?
5    A.   E.
6    Q.   Just the letter E?
7    A.   Just the letter E.
8    Q.   And then there was another guy
9  whose name you said.  I think you said
10 Chuck or Charles Starks; is that correct?
11   A.   Charles Starks.
12   Q.   Okay.  Do you recall any nicknames
13 that Charles Starks went by?
14   A.   Charliemo.
15   Q.   So Charliemo would be one word
16 again?
17   A.   Yes.
18   Q.   And it would be Charlie with mo
19 attached to it?
20   A.   Yes.
21   Q.   How long was your conversation with
22 Merrill roughly?
23   A.   30 minutes.
24   Q.   And after you were done -- well,

51

1  before I go there, during the entire
2  30 minutes of your conversation with
3  Merrill did anybody else attend other
4  than the folks you already named or
5  identified?
6    A.   I recall a few officers in and out
7  of the interview room, but I don't have -- I
8  don't got any names.
9    Q.   These are Crestwood officers?
10   A.   Correct.
11   Q.   And as of the day of the incident
12 did you -- do you know what vehicles were
13 associated with Clarence Bowers?
14   A.   I had intelligence about a vehicle
15 that came back to him, but I don't know the
16 description of it.
17   Q.   Okay.  Do you remember it was either
18 a Chevy Impala or a Dodge Durango?
19   A.   Dodge Durango sounds familiar.
20   Q.   But you don't recall one way or the
21 other for sure?
22   A.   No.
23   Q.   Okay, and the same question for
24 Marvin Jones.  As of July 26th did you know

52

1 any particular vehicle that he was associated
2 with?
3    A. No.
4    Q. And then the same question for the
5 other suspects. Chucky for example. Did
6 you know any vehicles that he was associated
7 with, Chucky Dennis?
8    A. Just a Buick. A Buick LaCrosse.
9    Q. And then Ernest Booth, do you know
10 any vehicles he was associated with?
11    A. No. He's not known to drive.
12    Q. All right. What about Charles Starks?
13    A. Oldsmobile Cutlass.
14    Q. So after your conversation with
15 Merrill did you report the information that
16 you had obtained to any Crestwood officers?
17    A. I did.
18    Q. Do you recall the names of those
19 officers?
20    A. It was in fact a detective, but I
21 can't recall his name.
22    Q. Does Alexander sound right?
23    A. I wouldn't even be able to say yes
24 or no.

53

1    Q. Okay. But did you report that
2 name? I'm sorry. Did you report that
3 information to this detective on the date
4 of -- on the same date you talked to
5 Merrill?
6    A. Yes, I did.
7    Q. Did you show this detective any
8 of the photographs that you had shown to
9 Merrill?
10    A. Yes.
11    Q. And did you indicate to the detective
12 that Merrill picked out these two photographs
13 of Bowers and Jones?
14    A. Yes.
15    Q. Did this detective -- what did this
16 detective tell you, if anything?
17    A. He worked the case. He took -- I
18 turned the case over to him and gave him the
19 information that I obtained from Merrill and
20 from that point moving forward he talked to
21 his bosses. The next thing I know we were
22 riding with the Cook County Fugitives looking
23 for him.
24    Q. And you were part of -- you were

54

1 also riding with the Fugitive Unit?
2    A. Yes.
3    Q. I want you to -- this report. What
4 exhibit number is it?
5    A. Number 2.
6    Q. Two. This Exhibit 2, this is a
7 report that you wrote and signed; is that
8 right?
9    A. That is right.
10    Q. Okay. So you indicated in here
11 that as you were driving down Wood Street
12 you -- you're the IO in there, correct?
13    A. Correct.
14    Q. Okay. You observed a vehicle that
15 you had prior knowledge that one of the
16 subjects frequently drives and then you
17 say that you notified the sheriff,
18 Sheriff Norton of this. And the vehicle
19 you indicated was parked in a parking lot
20 at 147th and Wood Street at which time
21 the driver exited the vehicle. Did I read
22 that correctly?
23    A. Correct.
24    Q. All right. Do you remember the

55

1 vehicle?
2    A. Yes.
3    Q. What was it?
4    A. It's a two door Nissan coupe.
5    Q. And so when you folks saw the
6 vehicle -- and what was the next thing
7 that you guys did that you observed?
8    A. When the vehicle parked I wanted
9 to wait for a -- to make sure it was in
10 fact Clarence. Once he got out I positively
11 identified him as Clarence Bowers from my
12 prior contacts. At that time I notified
13 Sheriff Norton that that was in fact the
14 subject. At that time he exited along
15 with other county guys and they apprehended
16 him.
17    Q. Okay. And was he apprehended inside
18 of a store?
19    A. Yes.
20    Q. And I think it was called Mr. T's;
21 is that right?
22    A. I'm not sure of the name, but it's
23 like some sort of T-shirt store.
24    Q. All right. And did you go in and

56

1 were you part of the team of guys that
2 apprehended him?
3    A.   I didn't take him into custody,
4 but I was riding with the guys.
5    Q.   Did you observe him being handcuffed
6 and so forth?
7    A.   I did.
8    Q.   Okay.  Did you hear what he said as
9 this was going on, if anything?
10    A.   No.
11    Q.   And more specifically, did you hear
12 him make any admissions to criminal activity?
13    A.   No.
14    Q.   Do you recall more specifically
15 if he said something along the lines of
16 what's going on or what am I being arrested
17 for?
18    A.   I can't -- I can't recall.
19    Q.   Okay.  So once he was apprehended
20 in the store where was he taken?
21    A.   To the Crestwood Police Department.
22    Q.   And it would be fair to say he was
23 handcuffed and taken in the back of a police
24 car?

                                                    57

1    A.   Yes.
2    Q.   Okay.  And before he was taken
3 away from the scene did you overhear
4 Clarence Bowers say anything?
5    A.   No.
6    Q.   And did anybody tell you that he
7 said anything that would constitute an admission
8 to criminal activity?
9    A.   No.
10    Q.   Did you or somebody that was with
11 you, one of the officers with you, undertake
12 a search of his vehicle?
13    A.   Yes.
14    Q.   And what did you find in there, if
15 anything?
16    A.   I don't recall anything being found.
17    Q.   Was anything found on his person
18 that you linked to the robbery, the AT&T
19 robbery?
20    A.   No.
21    Q.   And I take it from your answers
22 then you did not question him about the
23 robbery while you were in his presence at
24 the place where you apprehended him; is

                                                    58

1 that correct?
2    A.   That is correct.
3    Q.   Now after Bowers was apprehended
4 -- let me ask it this way first.  In your
5 mind when he was being apprehended was he
6 being placed under arrest for the robbery
7 or is he just being apprehended for further
8 investigation?
9    A.   Apprehended for further investigation.
10    Q.   Now after he was apprehended, sir,
11 what was the next thing that you did?
12    A.   I started to search for Marvin Jones
13 at that time.
14    Q.   Okay.  And what did you do to start
15 the search for Marvin Jones?
16    A.   I went to his residence where I had
17 prior contacts.
18    Q.   And did you actually go to the
19 residence?
20    A.   Yes.
21    Q.   So when you went to his residence what
22 did you do?
23    A.   I spoke to his father.
24    Q.   Did you know his father from any

                                                    59

1 prior contacts?
2    A.   Yes.
3    Q.   Did you have any pictures that you
4 showed his father?
5    A.   No.
6    Q.   What is his father's name?
7    A.   I just call him Mr. Jones.
8    Q.   Was anybody -- where did you speak
9 to his father inside his residence or outside?
10    A.   On the porch of his residence.
11    Q.   And when you spoke, what was the
12 conversation that you had with the father?
13    A.   I just told him that we were doing
14 an investigation and I needed to speak to
15 his son.  I had a few questions for him.  At
16 that time he told me that his son was at
17 work.  He gave me the location of his job
18 and he said if you want to go talk to him.  You
19 can catch him up there.
20    Q.   And he told you he works at a place
21 called Beggars Pizza?
22    A.   Yes.
23    Q.   And did you know where it was or did
24 you have to ask him?

                                                    60

1    A.   We asked him where it was.
2    Q.   And was he cooperative with your
3 questions?
4    A.   He was very cooperative.
5    Q.   By the way, who is with you from the
6 Fugitive Unit that you were with?
7    A.   Sheriff Norton.
8    Q.   And was he in a position where he
9 could hear your conversation with the father?
10   A.   Yes.
11   Q.   And so after the conversation --
12 I take it this is a 10 minute conversation
13 at most?
14   A.   Five minutes at most.
15   Q.   All right.  Did you go inside the
16 residence and look around at all?
17   A.   No.
18   Q.   Did any officer with you go inside
19 the residence?
20   A.   No.
21   Q.   Did you request permission to go
22 inside the residence to see if there would
23 be any contraband in there from the robbery?
24   A.   No.

61

1    Q.   Okay.  Any particular reason why
2 not?
3    A.   At that time I didn't have enough
4 to --
5    Q.   I'm sorry?
6    A.   We didn't have enough at that time
7 to even ask to go in.
8    Q.   Okay.
9    A.   And because I had prior contacts
10 with his father.  His father is a pretty
11 upstanding citizen.  I had no reason to
12 believe that he would allow his son to
13 hold anything or harbor anything at that
14 location.
15   Q.   And in your conversation with
16 the father did you indicate to him that
17 your son -- that there had been an AT&T
18 robbery?
19   A.   No.
20   Q.   Did you tell the father why you were
21 looking for his son?
22   A.   No.
23   Q.   Did the father ask you why?
24   A.   Yes.

62

1    Q.   And what was your response to
2 that?
3    A.   I advised him that it was an
4 investigation.  At that point we couldn't
5 reveal any information to him.
6    Q.   Can you recall anything about --
7 anything else about the conversation with
8 the father other than what you already
9 testified to?
10   A.   No.
11   Q.   So after the conversation was over
12 what was the next thing you did?
13   A.   We went to the Beggars Pizza and spoke
14 with management.
15   Q.   Okay.  Management told you that
16 Marvin Jones was out on a delivery at that
17 moment?
18   A.   Yes.
19   Q.   Did they give you any -- did they
20 indicate anything to the effect of Marvin Jones
21 had said he had been involved in some criminal
22 activity that day?
23   A.   No.
24   Q.   Did you ask him any of those

63

1 questions?
2    A.   No, I asked them what time had he
3 started work.
4    Q.   And what did they tell you?
5    A.   He said around 4:00.
6    Q.   In the afternoon?
7    A.   Yes.
8    Q.   By the way, going back to your
9 conversation with the father that you had
10 just prior.  Had you asked the father where
11 Marvin had been that day?
12   A.   I can't recall.
13   Q.   Now the management at Beggars Pizza
14 told you that Marvin Jones should be back
15 soon from his delivery, something to that
16 effect?
17   A.   Yes.
18   Q.   Do you remember anything else that
19 the managers told you?
20   A.   I asked them what kind of vehicle
21 was he in and they told me.
22   Q.   Do you remember what kind it was?
23   A.   It's like a Chevy Cavalier, two door.
24 I think it was white in color.

64

1    I also asked them when the workers
2 come back from you know doing deliveries
3 what entry do they come back into the store. So
4 I -- so we didn't create a big scene and
5 they said they usually come in through the
6 back.
7    Q.   All right.  So following that I
8 take it you were with -- there were two
9 vehicles from the Fugitive Unit there?
10    A.   About two or three.
11    Q.   Okay.  So following your conversation
12 with management you folks placed your vehicles
13 in some strategic location to wait for
14 Marvin Jones to come back?
15    A.   Correct.
16    Q.   And so how long did you wait for
17 Marvin Jones to come back?
18    A.   Between 30 minutes to an hour.
19    Q.   And during this time that you
20 waited 30 minutes to an hour did you do
21 any -- by telephone or radio or whatever,
22 did you do any further investigation into
23 the robbery?
24    A.   No.

65

1    Q.   Or did you get any further
2 investigation -- further information about
3 the AT&T robbery during that time?
4    A.   No.
5    Q.   So I take it after some period
6 of time you observed Marvin Jones to be
7 driving back toward where you guys were
8 staked out at the Beggars Pizza?
9    A.   Yes.
10    Q.   Can you describe what happened when
11 you observed him coming back?
12    A.   One of the Cook County cars they
13 turned on their emergency equipment.  Got
14 him out of the car.  Placed him in handcuffs.
15 I think he was transported to the
16 Crestwood Police Department.
17    Q.   So when you actually physically
18 took him into custody describe, sir, how
19 that went?
20    A.   I didn't actually take him into
21 custody.
22    Q.   Did you observe it happen?
23    A.   I did observe it.
24    Q.   Okay.  Tell me what you observed.

66

1    A.   I observed the county guys placing
2 his hands behind his back and putting
3 handcuffs on him.
4    Q.   Was he -- was Marvin Jones cooperative
5 with it?
6    A.   Yes.
7    Q.   Did he make any effort to flee that
8 you observed?
9    A.   No.
10    Q.   Were you in a position to hear
11 Marvin Jones talk?
12    A.   Yes.
13    Q.   And did you hear him say anything?
14    A.   He said I didn't do nothing.
15    Q.   Okay.  Other than that, do you recall
16 him saying anything?
17    A.   He said something to me, because he
18 knows me out of everybody, but I just can't
19 recall what it was.
20    Q.   Okay.  Whatever it was that he said
21 to you, was it any sort of admission to any
22 sort of criminal activity?
23    A.   No.
24    Q.   Did he say anything that caused you

67

1 to be suspicious that he had been involved
2 in that AT&T robbery?
3    A.   No.
4    Q.   And so after he was apprehended he
5 was placed into the -- one of the cars that
6 was there?
7    A.   I think he was placed into a Crestwood
8 squad car if I'm not mistaken.  I just can't
9 say for sure.
10    Q.   All right.  But you can say though
11 that you were not at the car that he was
12 placed into?
13    A.   No.
14    Q.   That's correct?
15    A.   That is correct.
16    Q.   All right.  So you didn't ride with
17 him back to the Crestwood station?
18    A.   No.
19    Q.   So before he left your presence
20 after being apprehended, sir, do you recall
21 Marvin Jones saying anything else?
22    A.   No.
23    Q.   And then I take it Marvin Jones
24 was searched; is that correct?

68

1    A.  Yes.
2    Q.  Was anything of interest or
3 incriminating found on his person?
4    A.  No.
5    Q.  What about the vehicle? I take it
6 that was searched as well; is that correct?
7    A.  Yes.
8    Q.  And was anything that was linked
9 to the AT&T robbery found in there?
10    A.  Not that I could recall.
11    Q.  And was the purpose of picking him
12 up for further investigation or was he under
13 arrest in your mind?
14    A.  Further investigation.
15    Q.  After he was picked up did you
16 go back to the -- did you follow him back
17 to the Crestwood station?
18    A.  No.
19    Q.  Where did you go after?
20    A.  I was dropped off at Hazel Crest.
21    Q.  By the Fugitive Unit?
22    A.  Yes.
23    Q.  Did you have any conversation with
24 -- by telephone or radio with any Crestwood

69

1 personnel after he was apprehended and while
2 you were -- and to the time you went to the
3 Hazel Crest station?
4    A.  No.
5    Q.  Did you have any conversation --
6 further conversation with anybody from
7 Crestwood that day?
8    A.  No.
9    Q.  Did you have an understanding from
10 any prior conversations that you had with
11 Crestwood folks, before you went out to
12 apprehend these guys, whether or not was
13 the intent to place them into some sort of
14 line-up?
15    MS. SCHNIDT: Objection, speculation,
16 foundation.
17    MR. FOX: And I'm just asking if you had
18 conversation along those lines. You can answer
19 that.
20    THE WITNESS: No.
21 BY MR. FOX:
22    Q.  Did you know from any source
23 whatsoever if there was an intention to
24 place either of these guys into a line-up

70

1 once they were apprehended?
2    A.  No.
3    Q.  And by the way, when you were
4 at the Crestwood station previously at
5 some point in time that you had talked
6 to Merrill did you -- did you observe any
7 of the witnesses to the AT&T robbery at
8 the Crestwood station?
9    A.  I did.
10    Q.  Okay. Did you overhear any of them
11 saying anything or did you talk -- one question
12 at a time. Did you overhear any of them saying
13 anything?
14    A.  No.
15    Q.  Did you talk to or did you try to
16 talk to any of them?
17    A.  No.
18    Q.  While you were at the Crestwood
19 station did you observe the offender Merrill,
20 who was already in custody, being placed into
21 any sort of line-up?
22    A.  No.
23    Q.  And so then after you were -- now
24 I'm directing your attention back in time

71

1 to the point in time that you were dropped
2 off at the Hazel Crest station after you
3 apprehended Marvin Jones. Did you do
4 anything else to investigate the AT&T
5 robbery that had occurred on that day?
6    A.  No.
7    Q.  Were you aware from any source
8 that day that either Jones and/or Bowers
9 were being transported to other police
10 stations that day?
11    A.  No.
12    Q.  Did you ever find out that that
13 happened?
14    A.  No.
15    Q.  Did you have any understanding
16 that day -- did you have any understanding
17 from any source what was going to be done
18 with Clarence Jones and/or Marvin? I'm
19 getting the names wrong. Let me back up.
20    Did you have any understanding from
21 any source that day what Crestwood intended
22 to do in furtherance of their investigation
23 with Clarence Bowers and/or Marvin Jones?
24    MS. SCHNIDT: Speculation. Foundation.

72

1    MR. FOX: You can answer.
2    THE WITNESS: No.
3 BY MR. FOX:
4    Q.   And as of that day at the time
5 you got -- you were dropped off at
6 Hazel Crest you were done with your part
7 of the investigation?
8    A.   Yes.
9    Q.   And you took no further role in it?
10    A.   I did my case report when I got back
11 to Hazel Crest and that was the end of it.
12    Q.   Okay.  And we looked at the
13 supplementary report.  This is what you are
14 referring to?
15    A.   Yes.
16    Q.   Okay.  And then you don't recall
17 if there's a report of your conversation
18 with Merrill; is that correct?
19    A.   There has to be another report
20 attached to this because it says A.  So I have
21 a original case report somewhere and it's going
22 to be at Hazel Crest, but I'm not sure what's
23 exactly in that original report.  There's
24 definitely another report to this.

73

1    MR. FOX: Okay.  Counsel, do you think
2 you can search for that?
3    MR. ZIMMER: We'll get it.
4    MR. FOX: Great.  Why don't we take a
5 break and I have a little bit more, but not
6 much more.
7    THE WITNESS: Okay.
8              (Whereupon, a short break was
9               taken.)
10 BY MR. FOX:
11    Q.   Back on the record.
12         There's that other exhibit.  It
13 must be one.  It's actually two reports.  It
14 looks like -- and it's stapled together.  If
15 you could just leaf through those because
16 my first question is just going to be if
17 you've ever seen that report before.
18    A.   No.
19    Q.   Okay.  Well, leaf through it, and
20 just make sure you haven't seen any other
21 pages.  This is a Crestwood Police Department
22 supplemental report.
23    A.   No, I never seen it before.
24    Q.   Okay.  If you could just go to

74

1 page 4.  There's numbers.  I'm sorry,
2 page 5.  There's numbers in the lower
3 right corner.
4    A.   Okay, page 5.
5    Q.   Yes.  And I'll just ask you to
6 read to yourself beginning with the first
7 full paragraph where it says I now interviewed
8 and that paragraph has a paragraph below that.
9 If you could just read that to yourself and
10 then I'm going to ask you a few questions.
11    A.   Okay.
12    Q.   So the first paragraph I asked you
13 to read begins who -- by the person who wrote
14 this says:  I now interviewed the offender
15 now identified as -- and then it goes on.  Are
16 you aware of the interview that's being
17 described in this paragraph?
18    A.   No, I'm not.
19    Q.   And then when you see the name --
20 it says he has Juvenile Officer/Sergeant
21 Michael Hask.  H-a-s-k.  Is that right?  Am
22 I reading that right?  H-a-s-k.  Is that right?
23    MS. SCHNIDT:  H-a-a-k.
24    MR. FOX:  I'm sorry, H-a-a-k.

75

1 BY MR. FOX:
2    Q.   Does this refresh your recollection
3 as to the name of the juvenile officer that
4 you had?
5    A.   No.
6    Q.   Okay.  Do you know if it was not
7 him?
8    A.   I'm not -- I can't say.
9    Q.   You don't know one way or the other?
10    A.   Correct.
11    Q.   Okay.  And you see the name after
12 that where it says Detective/Commander A.
13 Ronan.  Do you recall talking to him about
14 anything?
15    A.   I do recall talking to Ronan at
16 some point.
17    Q.   Okay.  Was he -- do you remember
18 if he was the fellow that you talked with
19 after your interview with Merrill?
20    A.   It could have been.  I'm just not
21 one hundred percent sure.
22    Q.   All right.  And then going down
23 to the next paragraph.  It says here the
24 offender advised me that while at a party

76

1 that he attended recently in the town
2 of Hazel Crest he met a couple of guys
3 by the street name of Ryan and Chucky
4 or CB. The name Ryan, reading that, do
5 you know that name?
6 　　A.　I do know Ryan.
7 　　Q.　Do you know --
8 　　A.　Not in this case though.
9 　　Q.　I'm sorry?
10 　　A.　Not in this case.
11 　　Q.　Okay. And so would it be fair to
12 say that Ryan is not a nickname that you know
13 of for Marvin Jones?
14 　　A.　Correct.
15 　　Q.　Okay. And then you also know a
16 guy -- one of the suspects you named was
17 named Chucky, correct?
18 　　A.　Correct.
19 　　Q.　And then another one was CB, which
20 is a nickname for Clarence Bowers; is that
21 correct?
22 　　A.　Correct.
23 　　Q.　And Chucky is a different guy than
24 Clarence Bowers; is that right?

77

1 　　A.　That is.
2 　　Q.　Based on your understanding?
3 　　A.　Yes.
4 　　Q.　And then if you can go down. Go
5 down from there. There's a sentence that
6 begins -- there were eight subjects total
7 that the offender states were involved in
8 the planning and execution of the robbery.
9 That's something different than what he
10 told you; is that correct?
11 　　A.　Yes.
12 　　Q.　Because he told you there were
13 four subjects including himself.
14 　　A.　Well, on the scene he told me there
15 was four subjects. Well, four subjects
16 including himself.
17 　　Q.　Okay. Did he say that anybody else
18 was involved that were not on the scene?
19 　　A.　No.
20 　　Q.　And then it says here Ryan and --
21 probably the offender's name is blacked out.
22 Ryan and the blacked out name drove separately
23 in a dark colored Dodge Durango. Do you
24 recall any reference to a Dodge Durango while

78

1 you were talking to Merrill?
2 　　A.　Yes.
3 　　Q.　Do you recall now that he said
4 that's the car that he drove into the AT&T?
5 　　A.　I recall something about a Dodge
6 Durango, but I can't recall if that was the
7 car he drove in or not.
8 　　Q.　Okay. And then it says -- like
9 another sentence down it says: There were
10 three unknown subjects that were parked at
11 the east end of the small shopping center
12 that the AT&T store is located in. So is
13 that different than what he told you?
14 　　A.　I recall him telling me it was
15 two subjects in that vehicle.
16 　　Q.　Okay. It says they were sitting in
17 a red Chevy Impala. Do you see that?
18 　　A.　Yes.
19 　　Q.　Do you recall -- is that what he
20 told you about the other car or do you not
21 recall one way or the other?
22 　　A.　I don't recall one way or another.
23 　　Q.　All right. And then it says a
24 second vehicle, a silver Chevy Impala, with

79

1 the subject CB/Chucky in it with two other
2 unknown subjects who were parked across the
3 street in the parking lot of the Boston Market.
4 Do you recall if he told you -- if he told you
5 what I just read?
6 　　A.　I think that he told me that
7 specifically. I do recall a Chevy Impala. The
8 silver one now, but I don't remember the red
9 one.
10 　　Q.　Okay.
11 　　A.　With the three subjects inside of
12 it at all.
13 　　Q.　Okay. And he didn't -- he didn't
14 use the name CB to you; is that correct?
15 　　A.　That is correct.
16 　　Q.　All right. And he told you -- I'm
17 just trying to make sure I got this right. That
18 there were two subjects that were waiting in
19 a vehicle standing by; is that right?
20 　　A.　Yes.
21 　　Q.　Okay. All right. And then were
22 you aware that there was a video that was
23 at the AT&T store that contained some footage
24 of what was going on?

80

1    A.   I'm aware of it.
2    Q.   Where did you learn that?
3    A.   While I was at the Crestwood Police
4  Station.  They said they were trying to obtain
5  the video.
6    Q.   So you've never seen that video I
7  take it?
8    A.   No.
9    Q.   All right.  Have you ever seen any
10  witness statements to the AT&T robbery?
11    A.   No.
12    Q.   And did you know -- I think I asked
13  you this and if I did I apologize.  Did you
14  know CB, Clarence Bowers, to be associated
15  with a silver Impala?
16    A.   No.
17    Q.   All right.  I might be done.  Let
18  me just look at my notes.
19    A.   (Nodding)
20    Q.   Have you talked to any State's Attorney
21  in connection with this investigation?
22    A.   No.
23    Q.   And was it Detective Ronan who you
24  gave -- who you told about your interview with

81

1  Merrill after you were done with your
2  interview with Merrill?
3    MR. ZIMMER:  Objection, asked and answered.
4    MR. FOX:  If you recall.
5    THE WITNESS:  I don't recall for sure if
6  it was him or not.
7  BY MR. FOX:
8    Q.   Okay.  But it was some Crestwood
9  officer?
10    A.   Yes, it was a detective.
11    Q.   I'm sorry, detective.
12    A.   (Nodding)
13    Q.   And did you ever find out anything
14  about why Clarence Bowers and Marvin Jones
15  were released from custody in connection
16  with this?
17    A.   No.
18    MR. FOX:  All right.  I have nothing
19  further.
20
21            EXAMINATION
22  BY MS. SCHNIDT:
23    Q.   I'll move over here.
24    A.   Okay.

82

1    Q.   Officer, my name is Emily Schnidt
2  and I introduced myself earlier.  I represent
3  the Crestwood police officers and the Village
4  of Crestwood.
5    A.   Okay.
6    Q.   You just said it was a Crestwood
7  detective that you spoke with after
8  interviewing Merrill.  How did you know it
9  was a detective?
10    A.   Because I asked specifically to
11  speak with the detective about my findings
12  after speaking with Merrill.
13    Q.   So because you asked to speak to
14  a detective, and you spoke with somebody,
15  you're assuming that person was a detective?
16    A.   Correct.
17    Q.   Okay.  How did you know it was a
18  Crestwood -- just putting aside the detective
19  part.  How did you know it was a Crestwood
20  officer that you spoke to?
21    A.   Because I assumed it was all
22  Crestwood officers present for their
23  investigation.
24    Q.   So do you know that there were

83

1  other police departments that were involved
2  in this investigation?
3    A.   Not until I was advised by
4  Crestwood officers that county was going
5  to be assisting.
6    Q.   Okay.  So simply because you
7  assumed it was strictly Crestwood police
8  officers that were involved in this
9  investigation you're saying it was a
10  Crestwood detective that you spoke to?
11    A.   Possibly.
12    Q.   Okay.  Do you recall what specifically
13  you told that person after interviewing Merrill?
14    A.   I just advised him of the conversation
15  that I had with Merrill.  I gave him -- I told
16  him the subjects that Merrill had positively
17  identified as being involved that -- umm --
18  I knew of.
19    Q.   Okay.  So this is fairly typical.  When
20  you say specifically what you said, I want to
21  know what you said.  If you don't know then
22  that's fine.  If you're just giving me the
23  gist of what the conversation was.
24    A.   Yes, I'm not -- I'm probably not

84

1  going to remember exactly what I said,
2  but I know that's the gist of it.
3      Q.  All right.  So tell me if I'm
4  correct.  You advised them that you had a
5  conversation with Merrill; is that correct?
6      A.  Yes.
7      Q.  Okay.  And did you go into the
8  details of that conversation with Merrill
9  or did you just say I had a conversation
10  with him and he identified some people?
11      A.  We went -- I went into a bit of
12  detail about the conversation with Merrill.
13      Q.  Okay.  Did you state the names of
14  the people that Merrill had identified?
15      A.  I did.
16      Q.  And what were those names?
17      A.  Marvin Jones and Clarence Bowers.
18      Q.  Those were the names that you gave
19  to that officer you spoke with?
20      A.  Correct.
21      Q.  And you said that you showed the
22  photographs.  Did you place them on a table
23  in front of that person for that person to
24  look at them and study them?
                                              85

1      A.  I can't recall if I put them on
2  a table or not, but I know that I showed
3  him the photos.
4      Q.  Meaning it was your hand and you
5  said I showed him these photos and these are
6  the two people that he identified?
7      A.  Correct.
8      Q.  Okay.  And after having that
9  conversation is when you left Crestwood to
10  then pick up Marvin Jones and Clarence Bowers?
11      A.  Yes.
12      MS. SCHNIDT:  Okay.  I have no other
13  questions.
14      MS. O'CONNOR:  I have a couple questions.
15      THE WITNESS:  Okay.
16
17              EXAMINATION
18  BY MS. O'CONNOR:
19      Q.  My name is Anna O'Connor and I'm
20  with the Fugitive Unit.
21      A.  Okay.
22      Q.  Sir, you mentioned earlier that
23  you recall somebody named Ryan after reading
24  your report, but you didn't identify Ryan
                                              86

1  as Marvin Jones, correct?
2      A.  Correct.
3      Q.  Okay.  Who do you know with the
4  nickname Ryan?
5      A.  Someone who wasn't involved in
6  this incident.
7      Q.  Is that individual generally
8  associated with these individuals that were
9  suspects?
10      A.  Yes.
11      Q.  Is this Ryan individual that you
12  recall is he -- if you know, is he related
13  at all to Clarence Bowers?
14      A.  He's a good friend of the family,
15  but he's deceased.  He was deceased at the
16  time of this incident.  That's why I didn't
17  print his photo.
18      Q.  And based on prior knowledge in
19  your work with Hazel Crest, sir, were you
20  aware whether or not Marvin Jones was also
21  associated with Ryan?
22      A.  Yes, he was.
23      Q.  Okay.  And is it common in prior
24  investigations for someone to use false
                                              87

1  names?
2      A.  Yes, it is.
3      MS. O'CONNOR:  No further questions.
4      MR. ZIMMER:  Anybody else?
5      MR. FOX:  Just a little bit.
6      MR. ZIMMER:  Okay.
7
8           FURTHER EXAMINATION
9  BY MR. FOX:
10      Q.  In connection with the person who
11  you assumed to be a Crestwood detective that
12  you talked with after you had your interview
13  with Merrill, sir, would it be fair to say
14  you knew that was not a member of the
15  Cook County Fugitive Unit or Sheriff's
16  Department; is that correct?
17      A.  At that time I didn't believe it
18  was.
19      Q.  Right.  Well, you travelled with
20  them subsequently, correct?
21      A.  Correct.
22      Q.  And it was not any of those people,
23  was it?
24      A.  No.
                                              88

1  Q.   Okay.  That's correct?
2  A.   That is correct.
3  MR. FOX:  Okay.  I have nothing further.
4  MS. SCHNIDT:  Nothing further.
5  MS. O'CONNOR:  Nothing further.
6  MR. ZIMMER:  Waived.
7       (FURTHER DEPONENT SAITH NOT.)
8            (whereupon, the proceedings
9             concluded at 11:20 a.m.)

1  and afterwards reduced to typewriting by
2  Computer-Aided Transcription, and the
3  foregoing is a true and correct transcript
4  of the testimony so given by said witness
5  as aforesaid.
6       I further certify that the signature to
7  the foregoing deposition was waived by counsel
8  for the respective parties.
9       I further certify that the taking of
10 this deposition was pursuant to notice and
11 that there were present at the deposition
12 the attorneys hereinbefore mentioned.
13      I further certify that I am not counsel
14 for nor in any way related to the parties to
15 this suit, nor am I in any way interested in
16 the outcome thereof.
17      IN TESTIMONY WHEREOF:  I have hereunto
18 set my hand and affixed my notarial seal this
19 12th day of June, 2015.
20
21
22
23      NOTARY PUBLIC, COOK COUNTY, ILLINOIS
24      LIC. NO. 084-004459

1  STATE OF ILLINOIS      )
2                         )  SS:
3  COUNTY OF C O O K      )
4       I, Dawn C. Evers, a Notary Public within
5  and for the County of Cook County and State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, on the 22nd day of May 2015, personally
8  appeared before me, at 3700 175th Place,
9  Country Club Hills, Illinois, OFFICER
10 DERRICK A. CHAMBLISS, Star No. 78, in a
11 cause now pending and undetermined in the
12 Circuit Court of Cook County, Illinois, and
13 the United States District Court, Northern
14 District of Illinois, Eastern Division,
15 wherein CLARENCE BOWERS and MARVIN JONES are
16 the Plaintiffs and VILLAGE OF CRESTWOOD,
17 ET AL., are the Defendants.
18      I further certify that the said
19 OFFICER DERRICK A. CHAMBLISS, Star No. 78,
20 was first duly sworn to testify the truth, the
21 whole truth and nothing but the truth in the
22 cause aforesaid; that the testimony then given
23 by said witness was reported stenographically
24 by me in the presence of the said witness,



**Exhibits**

Exhibit 1
5:17
Exhibit 2
5:18 40:8 55:6

**1**

**1**
6:2 23:5 24:1
**10**
61:12
**11:20**
89:9
**147th**
55:20
**160**
25:2
**165**
24:11
**170**
24:11
**185**
24:1

**2**

**2**
6:2 40:8,9,10 55:5,6
**2012**
7:17
**2013**
17:17
**2014**
9:17 10:11 12:9
13:1,16 15:3 17:2
18:4
**20s**
25:23
**215**
28:1
**240**
23:5
**26th**
12:9 13:1,10,16
14:4,8,13,18 15:3
16:7 17:2,6 18:4,10,
15 22:1 52:24

**3**

**30**
25:19 51:23 52:2
65:18,20
**30s**
23:2

**4**

**4**
75:1
**4:00**
64:5

**5**

**5**
75:2,4
**5'6**
24:11 25:2 28:1

**6**

**6**
23:5 24:1

**7**

**78**
6:15

**A**

**a.m.**
89:9
**ABM**
10:5
**access**
45:12 46:18
**accompanied**
34:6
**accurate**
31:23
**accurately**
8:24
**activity**
15:5 16:9 17:1,8
57:12 58:8 63:22
67:22
**actual**
43:5,9
**add**
34:2
**address**
43:7
**addresses**
45:21
**admission**
58:7 87:21
**admissions**
57:12
**advise**
35:15
**advised**
16:16 44:10 63:3
76:24 84:3,14 85:4
**afternoon**
64:6
**age**
23:1 25:18,19,22
**agencies**
9:12
**agreed**
6:20
**ahead**
40:17
**ahold**
39:20 45:19,23
**Alexander**
53:22
**altogether**
42:11
**ambulance**
7:19
**and/or**
44:18 72:8,18,23
**Anna**
86:19
**answers**
58:21
**anybody's**
45:20
**anyone's**
39:21
**apologize**
81:13
**appearance**
25:8
**applicable**
7:6
**apprehend**
70:12
**apprehended**
56:15,17 57:2,19
58:24 59:3,5,7,9,10

**B**

**B-o-o-t-h**
24:23
**Bachelor's**
10:8
**back**
12:9 15:13 28:15
31:17 32:4 34:17,21
35:6 52:15 57:23
64:8,14 65:2,3,6,14,
17 66:7,11 67:2
68:17 69:16 71:24
72:19 73:10 74:11
**based**
20:19 78:2 87:18
**battery**
13:13
**beard**
24:3 25:6
**Beggars**
60:21 63:13 64:13
66:8
**beginning**
75:6

**begins**
75:13 78:6
**big**
65:4
**bit**
74:5 85:11 88:5
**black**
22:22 23:2 25:16
**blacked**
78:21,22
**body**
43:13
**Booth**
24:21 25:21 26:10
51:3 53:9
**bosses**
54:21
**Boston**
80:3
**bottom**
43:6,11
**Bowers**
6:22 14:6,12 15:4
18:9 21:12 22:3
23:19 36:23 38:16
44:8 46:1 49:1 50:3,
8,16 52:13 56:10,11
58:4 72:18,23 77:20,
24 81:14 82:14
85:17 86:10 87:13
**break**
9:2 74:5,8
**bring**
48:24
**brought**
41:13
**Buick**
53:8
**burglary**
26:16

**C**

**C-h-a-m-b-l-i-s-s**
6:15
**C-h-u-c-k-m-o**
38:24
**call**
19:7 24:17 60:7
**called**
56:20 80:21
**calls**
13:8
**captured**
32:2
**car**
36:12 47:6,8 57:24
66:14 68:8,11 79:4,
7,20
**Carry**
47:4
**cars**
66:12 68:5
**case**
6:21,22 7:13,14,18,
20 11:19 12:1,6 14:3
18:3 20:24 35:17,19
39:22 41:5,10 42:18,
19 54:17,18 73:10,
21 77:8,10
**cases**
10:18,23 11:2
**catch**
60:19
**caught**
19:23
**caused**
67:24

**Cavalier**
64:23
**CB**
50:9 77:4,19 80:14
81:14
**CB/CHUCKY**
80:1
**cell**
32:20
**center**
79:11
**Chambliss**
6:1,8,14,19
**Charles**
27:16,18,20 28:19
51:10,11,13 53:12
**Charlie**
51:18
**Charliemo**
51:14,15
**check**
41:2
**Chevy**
52:18 64:23 79:17,
24 80:7
**Chuck**
27:16,18 51:10
**Chuckmo**
38:21 49:3 50:13,16
**Chucky**
21:12,19 23:1,14
25:24 28:19 35:22
37:14 38:2,21 49:2
50:20 53:5,7 77:3,
17,23
**Cicero**
19:22
**citizen**
47:3 62:11
**Civil**
7:7
**Clarence**
6:22 14:6,12 15:4
18:9 21:12 22:3
23:19 36:23 38:15
44:8 46:1 49:1 50:3,
8,16 52:13 56:10,11
58:4 72:18,23 77:20,
24 81:14 82:14
85:17 86:10 87:13
**clothes**
12:14,20
**Club**
9:13,16
**cocaine**
16:21
**color**
64:24
**colored**
20:20 78:23
**committed**
22:11
**committing**
17:3
**common**
87:23
**communication**
45:1
**Concealed**
47:4
**concluded**
89:9
**confidential**
14:2,12,17
**connection**
10:13 11:19 14:3
15:20 17:21 20:18
29:3,12 46:6 81:21
82:15 88:10

**constitute**
58:7
**contacted**
19:18,20
**contacts**
13:5,6,15,19 14:17,
19,20 15:24 23:20
56:12 59:17 60:1
62:9
**contained**
80:23
**contraband**
61:23
**controlled**
16:19
**conversation**
35:12 37:9 40:3,19,
23 41:14,19 44:20
51:21 52:2 53:14
60:12 61:9,11,12
62:15 63:7,11 64:9
65:11 69:23 70:5,6,
18 73:17 84:14,23
85:5,8,9,12 86:9
**conversations**
70:10
**convicted**
26:6,11
**conviction**
26:7
**Cook**
54:22 66:12 88:15
**cooperative**
61:2,4 67:4
**corner**
75:3
**Corporate**
10:3
**correct**
6:17,22 11:20 19:4
21:4 23:21,22 30:3,6
31:7,9,10,19,22
32:3,16,17 35:10,11
37 14,15,22 38:10
39:1 40:21 42:7,8
44:17 46:3,5 49:5.
10,13,14 51:10
52:10 55:12 53:13,23
59:1,2 65:15 68:14,
15,24 69:6 73:18
76:10 77:14,17,18,
21,22 78:10 80:14,
15 83:16 85:4,5,20
86:7 87:1,2 88:16,
20,21 89:1,2
**correctly**
29:20 42:20 55:22
**Counsel**
74:1
**Country**
9:13,16
**county**
54:22 56:15 66:12
67:1 84:4 88:15
**coupe**
56:4
**couple**
40:15 77:2 86:14
**court**
8:24 10:19,21
**covert**
33:16
**create**
65:4
**Crest**
9:7,10,18,20 12:11
16:4 18:19 20:1,4
21:3,22:16 27:5,21
33:7 41:2,8 45:9
47:17 69:20 70:3
72:2 73:6,11,22 77:2



87:19

**Crestwood**
11:13,17 18:24
19:19 20:22 29:5,7,
8,11,18 31:16,18
32:5 34:17,21 35:9
44:16 45:3 52:9
53:16 57:21 66:16
68:7,17 69:17,24
70:7,11 71:4,8,18
72:21 74:21 81:3
82:8 83:3,4,6,18,19,
22 84:4,7,10 86:9
88:11

**criminal**
10:8 15:5 16:9 17:1,
8 57:12 58:8 63:21
67:22

**current**
45:21

**custody**
19:23 29:12 30:22
31:21 32:7 57:3
66:18,21 71:20
82:15

**Cutlass**
53:13

**D**

**dark**
78:23

**database**
20:21 46:19

**date**
17:15 18:14 54:3,4

**day**
19:13 33:17 52:11
63:22 64:11 70:7
72:5,8,10,16,21 73:4

**dealing**
7:20

**deceased**
87:15

**degree**
10:10

**deliveries**
65:2

**delivery**
63:16 64:15

**Demetrius**
29:15

**Dennis**
21:13 23:1,14 25:24
53:7

**Dennis's**
21:19

**department**
9:8,10,14 11:14,18
15:10,16,18 16:1,15
17:13 18:20,24 20:4,
22 22:6,18 27:6 29:5
33:8 41:3 57:21
66:16 74:21 88:16

**departments**
84:1

**DEPONENT**
89:7

**deposition**
6:1,19,20 7:4,11,22
8:5 11:6,24

**depositions**
11:3

**Derrick**
6:8,16

**describe**
15:8 16:13 35:12
66:10,18

**description**
25:14 39:7 52:16

**descriptions**
20:11 31:24 35:2
39:3,10

**destroy**
39:19,22 45:16

**destroyed**
45:10

**detail**
33:17 35:16 85:12

**details**
85:8

**detective**
53:20 54:3,7,11,15,
16 81:23 82:10,11
83:7,9,11,14,15,18
84:10 88:11

**Detective/
commander**
76:12

**detectives**
20:23

**difficult**
8:23

**direct**
35:5

**directing**
71:24

**directly**
17:8

**discovered**
32:8 37:1 47:3

**District**
7:6

**document**
40:19,23

**Dodge**
52:18,19 78:23,24
79:5

**domestic**
13:13

**door**
56:4 64:23

**dreadlocks**
23:9,11 24:12 26:2
28:5

**drive**
53:11

**driver**
55:21

**Drivers**
21:8

**drives**
55:16

**driving**
55:11 66:7

**dropped**
69:20 72:1 73:5

**drove**
47:6 78:22 79:4,7

**drugs**
26:16 28:14

**duly**
6:5,9

**Durango**
52:18,19 78:23,24
79:6

**duty**
19:9

**E**

**earlier**
83:2 86:22

**Early**
23:2

**east**
79:11

**education**
10:7

**effect**
63:20 64:16

**effort**
67:7

**emergency**
56:13

**Emily**
83:1

**employed**
9:13,15

**employees**
47:1

**end**
73:11 79:11

**entire**
44:11 52:1

**entry**
65:3

**equally**
8:23

**equipment**
66:13

**Ernest**
24:21 25:21 26:10
51:3 53:9

**exact**
17:15

**EXAMINATION**
7:9 82:21 86:17 88:8

**examined**
6:9

**execution**
78:8

**exhibit**
6:2 40:6,8 55:4,6
74:12

**exited**
52:11 56:14

**extent**
26:15

**F**

**face**
23:18

**face-to-face**
59:11

**facial**
23:6 24:2 25:5 28:7
43:13,15

**fact**
22:11 27:12 30:21
38:7 44:23 53:20
56:10,13

**fair**
25:15 31:2 40:18
57:22 77:11 88:13

**fairly**
84:19

**false**
87:24

**familiar**
52:19

**family**
87:14

**father**
59:23,24 60:4,9,12
61:9 62:10,16,20,23
64:3,9,10

**father's**
60:6

**features**
28:10

**Federal**
10:19

**fellow**
25:10 45:6 51:4
76:18

**fellows**
50:18

**felt**
48:16,23

**female**
47:24

**find**
30:11 58:14 72:12
82:13

**findings**
83:11

**fine**
84:22

**finish**
8:15,17

**flee**
67:7

**fold**
42:13 43:8

**folder**
41:24 42:2,3 45:8

**folks**
35:8 52:4 56:5 65:12
70:11

**follow**
69:16

**follow-up**
48:17

**foot**
23:5 24:1

**footage**
80:23

**forested**
30:5

**forgot**
27:4

**form**
48:6

**forward**
54:20

**foul**
13:23 14:24

**found**
30:13 58:16,17 69:3,
9

**foundation**
70:16 72:24

**FOX**
6:12,16,18 7:3,10
11:20,22 70:17,21
73:1,3 74:1,4,10
75:24 76:1 82:4,7,18
88:5,9 89:3

**frequently**
55:16

**friend**
87:14

**front**
40:5 85:23

**Fugitive**
55:1 61:6 65:9 69:21

**Fugitives**
54:22

**full**
43:13 75:7

**furtherance**
72:22

**G**

**gave**
29:4 35:23 37:5,13,
16,17 38:1,13,14,19
39:8 41:18 48:15,19
49:6 54:18 60:17
81:24 84:15 85:18

**general**
8:5

**generally**
87:7

**girlfriend**
47:21,22,23

**girlfriends**
47:24

**gist**
84:23 85:2

**give**
19:6,17 20:13 22:24
23:3 28:16 30:24
36:17,20 37:2,8
38:4,7,11,15,18
46:20 48:13 63:19

**giving**
84:22

**good**
87:14

**Governor**
10:11

**Great**
74:4

**gun**
29:22 30:9,11 34:7
46:24

**guy**
25:24 27:13,16,17,
19 28:2 29:12 30:21
42:16 35:21 36:2
46:8 51:8 77:16,23

**guy's**
21:14 26:17,19

**guys**
19:24 20:9 22:21
24:16 35:20 47:13
56:7,15 57:1,4 66:7
67:1 70:12,24 77:2

**H**

**H-a-a-k**
75:23,24

**H-a-s-k**
75:21,22

**hair**
23:6 24:2 25:5 28:6,
7

**hairstyle**
23:8 24:4

**half**
42:14,23 43:1,8

**Halsted**
15:12 22:20

**hand**
86:4

**handcuffed**
57:5,23

**handcuffs**
66:14 67:3

**handgun**
29:24

**hands**
67:2

**happen**
66:22

**happened**
35:14 42:9 43:23
86:10 72:13

**harbor**
62:13

**Hask**
75:21

**Hazel**
9:7,10,18,20 12:11
16:4 18:19 20:1,4
21:3 22:16 27:5,21
33:7 41:2,8 45:9
47:17 69:20 70:3
72:2 73:6,11,22 77:2
87:19

**head**
8:22

**hear**
8:10 57:8,11 61:9
67:10,13

**heard**
8:9 50:15

**heavyset**
28:2

**height**
23:4,24 24:10,24
25:11 27:23

**highest**
10:6

**Hills**
9:14,16

**hold**
62:13

**Homewood**
15:10,18 16:1 21:21
22:5,16

**hour**
65:18,20

**hundred**
76:21

**I**

**idea**
8:6

**identification**
6:3

**identified**
44:2,8 45:24 48:20
52:5 56:11 75:15
84:17 85:10,14 86:6

**identify**
86:24

**identifying**
42:24 46:3,8

**identity**
45:22

**Illinois**
7:7

**image**
43:5,9

**images**
20:20 36:24

**Impala**
52:18 79:17,24 80:7
81:15

**incident**
16:6 47:21 48:3
52:11 87:6,16

**incidents**
48:23

**including**
36:14,15 78:13,16

**incorporated**
40:2

**incriminating**
69:3

**individual**
87:7,11

**individuals**
87:8

**inform**
34:20 35:1

**information**
16:3 19:17 20:13,16
27:12 28:20 29:1
30:24 31:3 34:10
39:19,21,23 42:15,
24 43:5,10 45:20
46:2,4,9,14,20
48:13,15,20 53:15
54:3,19 63:5 66:2

**initial**
28:21

**inside**
36:5 56:17 60:9
61:15,18,22 80:11



intel
21:20,23
intelligence
15:9,23 20:19 22:5,
10,17 33:23 50:4,7
52:14
intended
72:21
intent
70:13
intention
70:23
interaction
19:11
interest
69:2
interested
18:23 19:3
Interrogatories
11:11
interview
32:21 39:13 52:7
75:16 76:19 81:24
82:2 88:12
interviewed
75:7,14
interviewing
83:8 84:13
interviews
48:11
introduced
83:2
investigate
72:4
investigated
41:3
investigating
15:6
investigation
29:3 48:17 59:8,9
60:14 63:4 65:22
66:2 69:12,14 72:22
73:7 81:21 83:23
84:2,9
investigations
12:15 16:2 48:12
87:24
Investigatory
13:7 14:11
involved
15:4,11 17:9 19:24
20:9 21:14,21,24
22:6,19 35:17,19
36:8 39:4 44:24 45:2
47:13 48:22 63:21
68:1 78:7,18 84:1,8,
17 87:5
involvement
35:16
IO
55:12

J

job
60:17
join
33:9 10,13
Jones
6:21 13:2 17:6 18:5
21:12 22:9 24:9
36:23 37:1,3 38:9
44:2 46:1 49:16,23
52:24 54:13 59:12,
15 60:7 63:16,20
64:14 65:14,17 66:6
67:4,11 68:21,23
72:3,8,18,23 77:13
82:14 85:17 86:10
87:1,20

July
12:9 13:1,10,16
14:4,8,13,18 15:3
16:7 17:2,6 18:4,10,
15 22:1 52:24
Justice
10:8
juvenile
32:9,12,22 33:6 35:8
44:15 75:20 76:3

K

kind
7:18 10:2 13:6 16:3
38:13 46:11 47:5,8
64:20,22
knew
17:2 33:21 47:12,19
84:18 88:14
knowledge
48:22 55:15 87:18

L

Lacrosse
53:8
language
13:13 14:24
Late
25:23
leaf
74:15,19
learn
81:2
leave
9:18
leaving
15:14
left
27:5 28:17 36:4,6
44:12 68:19 86:9
length
23:12 24:15
letter
51:6,7
letters
41:10
level
10:6 48:14
license
13:14 15:13 21:8
43:8
Likewise
8:16
line-up
70:14,24 71:21
lines
57:15 70:18
linked
58:18 69:8
locate
29:22
located
79:12
location
60:17 62:14 65:13
long
8:1 12:16 23:11
24:13 25:3 48:1,2
51:21 65:16
looked
36:24 42:22 73:12
lookout
44:10
lookouts
36:12 47:9
lot
15:24 55:19 80:3

loud
8:21
lower
75:2

M

made
32:6,9
make
8:8 56:9 57:12 67:7
74:20 80:17
male
22:22 23:2 25:15
management
63:14,15 64:13
65:12
managers
64:19
marked
6:3
Market
80:3
Markham
16:15 21:20 47:18
Marvin
6:21 13:2 17:6 18:5
22:9 24:9
36:23 37:1,3 38:9
44:2 46:1 49:16,23
52:24 59:12,15
63:16,20 64:11,14
65:14,17 66:6 67:4,
18 68:21,23 72:3,18,
23 77:13 82:14
85:17 86:10 87:1,20
mastermind
35:23 44:9
Meaning
86:4
medium
23:12 24:15 25:4
meet
19:8,10 20:23
meeting
20:7 28:18,22
member
88:14
memo
40:2
mental
7:20
mentioned
20:3 26:1 86:22
Merrill
29:15,17 32:16 35:7
39:13 40:3,20 41:12
44:12,14,19 45:18
50:5,10,11,19 51:22
52:3 53:15 54:5,9,
12,19 71:6,19 73:18
76:19 79:1 82:1,2
83:8,12 84:13,15,16
85:5,8,12,14 88:13
met
19:12,16 35:20
47:20 48:2 77:2
Michael
75:21
mid
23:2
middle
9:3
mind
59:5 69:13
minor
32:8
minute
14:7 61:12

minutes
51:23 52:2 61:14
65:18,20
Mirandized
32:7
mistaken
16:21 68:8
Mitchell
18:19 19:5,7 20:2,7,
17 27:9 28:16,21
33:14
mo
51:18
mom
33:3
moment
63:17
month
12:7
mother
33:2
move
82:23
moved
46:13
moving
14:6 54:20
mustache
24:3

N

named
52:4 77:16,17 86:23
names
10:23 20:8 21:14
22:15 24:18 27:4,8
28:17 31:19 34:2
35:22 37:17 38:5,7,
11,19 45:21 52:8
53:18 72:19 85:13,
16,18 88:1
Narcolics
16:12
needed
60:14
nickname
49:7,13,15,17,20
50:12,15 77:12,20
87:4
nicknames
49:22 50:2,7,23
51:3,12
Nissan
56:4
Nodding
81:19 82:12
Nods
8:22
noon
19:15
Northern
7:6
Norton
55:18 50:13 61:7
Nos
6:2
notes
39:12,15 40:24
81:18
notice
7:5
notified
18:20,21 55:17
56:12
November
9:17
number
40:7 41:9 55:4,5

numbers
75:1,2

O

O'connor
6:24 86:14,18,19
88:3 89:5
Objection
70:15 82:3
observe
57:5 66:22,23 71:6,
19
observed
55:14 56:7 60:6,11,
24 67:1,8
obtain
81:4
obtained
33:22 34:9 53:16
54:19
occurred
19:1 72:5
offender
31:21 32:2 35:13
71:19 75:14 76:24
78:7
offender's
78:21
officer
6:8,14,19 8:2 9:7,11,
21 12:12,13,17,19
19:20 30:20,23 32:9,
22 33:6,7,20 34:5,
16,20 35:9 44:16
61:18 76:3 82:9
83:1,20 85:19
officer's
32:12
Officer/sergeant
75:20
officers
12:1,5 20:23 30:17
52:6,9 53:16,19
58:11 83:3,22 84:4,8
Oldsmobile
53:13
open
45:1
operation
44:9
opinions
48:6
orchestrated
44:11
order
43:21
original
73:21,23
originally
33:13
outcome
11:1 16:22 17:24
overhear
31:11 58:3 71:10,12

P

pages
74:21
paper
39:23
paragraph
75:7,8,12,17 76:23
parked
36:11 55:19 56:8
79:10 80:2
parking
55:19 80:3

part
54:24 57:1 73:6
83:19
partner
33:18
party
76:24
past
12:7 26:3,6,12
PCS
16:17
people
22:14 27:8 36:7,14
38:5 39:4 85:10,14
86:6 88:22
percent
75:21
period
66:5
permanent
33:18
permission
61:21
Permit
47:4
person
32:7 36:18 42:15
43:1 58:17 69:3
75:13 83:15 84:13
85:23 88:10
person's
43:7
personal
39:21 43:10
personnel
70:1
persons
33:21 34:2 44:21
45:24
phone
15:12 17:12,21 19:6,
21 22:7,11,19
photo
21:19 22:4 42:16,23
43:9 44:1 50:19
87:17
photograph
43:2
photographs
21:6 26:23 41:13
54:8,12 85:22
photos
20:20 21:1,10,13,16,
17 22:14 33:22
42:22 43:12,24 44:6,
14,19 45:5,12,17,20
46:8,13,16 48:21
86:3,5
physically
66:17
pick
86:10
picked
54:12 69:15
picking
69:11
picture
38:1,6 42:14,21 44:7
pictures
37:11,16,21 38:6
39:3,9 41:20 42:7,
11,12 60:3
Pizza
60:21 63:13 64:13
66:8
place
18:16 58:24 60:20
70:13,24 85:22
placing
67:1

plain
12:14,20,22
planning
78:8
plates
15:13
pocket
41:23
point
29:6 37:21 42:6 47:2
54:20 63:4 71:5 72:1
76:16
pointed
46:24
police
8:1 9:7,8,10,11,14,
20 11:9,12,13,16,17
12:1,5 15:10,16,18
16:1,15 17:12 18:20,
24 19:19 20:22 21:3
22:5,18 27:5 29:5,6,
18 30:17 31:16,18
33:8 34:21 36:5
39:24 40:1 41:2
46:2,9,11,16 47:1
57:21,23 66:16 72:9
74:21 81:3 83:3
84:1,7
porch
60:10
position
61:8 67:10
positively
48:20 56:10 84:16
Possibly
13:13 17:17 84:11
pounds
23:5 24:11 25:2 28:1
preliminary
11:9
preparation
11:5,23
presence
12:2,5 58:23 68:19
present
32:10 83:22
pretty
28:2 62:10
previously
71:4
print
21:10,17,19 22:4,8,
13 87:17
printed
20:20 21:2,6,16
22:22 26:23 27:19
prior
10:12 13:5,19 14:17,
20 15:9,23 16:16
20:19 21:1 22:5,17
23:20 28:13 35:21
47:20 48:3,22 50:4,6
55:15 56:12 59:17
60:1 62:9 64:10
70:10 87:18,23
probation
18:2
Procedure
7:7
proceeded
29:6
proceedings
7:23 89:8
prominent
24:7
Promotion
9:19
pulling
41:8
purpose
69:11

pursuant
7:5
put
45:8 46:9 86:1
putting
67:2 83:18

Q

question
8:8,15,18 9:4 17:5
18:9 25:21 26:9
28:16 51:2 52:23
53:4 58:22 71:11
74:16
questioning
48:24
questions
8:7 32:10 40:16
60:15 61:3 64:1
75:10 86:13,14 88:3

R

radio
65:21 69:24
rap
26:19
read
40:14 55:21 75:6,9,
13 80:5
reading
75:22 77:4 86:23
real
38:11
reason
9:3 26:22 46:15
62:1,11
recall
10:24 14:5,23 15:21
16:19 17:15,16
19:19 21:14 22:15
23:13,17,23 24:6,9,
13,18 25:11,13,14
26:15 27:13 29:10
32:14 33:3 35:22
36:21,22 37:5,7,17
38:8 39:10 41:14
43:21 50:20,23
51:12 52:8,20 53:18,
21 57:14,18 58:16
63:6 64:12 67:15,19
68:20 69:10 73:16
76:13,15 78:24 79:3,
5,6,14,19,21,22
80:4,7 82:4,5 84:12
86:1,23 87:12
recently
77:1
recollection
76:2
record
6:13,18 7:4 28:13
74:11
red
79:17 80:8
reference
20:24 78:24
referring
73:14
refresh
76:2
regard
17:6
registered
15:15
relate
16:4
related
87:12

released
82:15
remember
16:7,11 26:17,18,20
27:18,22,23 28:4,9,
12 29:16,20 30:4,19
38:19 41:1 43:20
47:11 49:12,15,20,
24 50:1,2 51:3 52:17
76:4 84:18,22
76:17 80:8 85:1
repeat
8:11
rephrase
8:11 14:16 37:19
report
11:9 40:2,5,11,14,
19,23 41:9,11 53:15
54:1,2 55:3,7 73:10,
13,17,19,21,23,24
74:17,22 86:24
reporter
8:24
reports
11:13,16 30:4 39:24
40:1 41:4 46:3,10,
11,17 74:13
represent
83:2
request
61:21
residence
13:8 59:16,19,21
60:9,10 61:16,19,22
resident
27:21
residents
22:16
response
63:1
retrieve
41:20
reveal
63:5
review
11:6,8,12
reviewed
11:16
rid
46:8
ride
34:15 68:16
riding
54:22 55:1 57:4
robberies
21:15,22 22:20 26:2,
6,11
robbery
15:12,20 17:12,22
18:15 19:1,21 20:18
21:24 22:7,11 29:13
31:5,6,15,20 32:1,11
33:11 34:6,23 35:3
39:5 44:11,20,21
46:21 47:14 58:18,
19,23 59:6 61:23
62:18 65:23 66:3
68:2 69:9 71:7 72:5
78:8 81:10
role
73:9
Ronan
76:13,15 81:23
room
32:21,23 35:6 44:15
52:7
roughly
19:14 23:24 25:1,12,
18,22 29:9 51:22
rules
7:6,7

Ryan
37:6 77:3,4,6,12
78:20,22 86:23,24
87:4,11,21

S

SAITH
89:7
scene
15:14 31:4,5,14
33:10 34:6,13 36:2
58:3 65:4 78:14,18
Schmidt
7:1 70:15 72:24
75:23 82:22 83:1
86:12 89:4
search
29:23 34:7 58:12
59:12,15 74:2
searched
30:8 68:24 69:6
Secretary
20:21 21:7 45:13
46:12,19
security
9:23 10:2,3,5
sense
48:5
sentence
78:5 79:9
separately
78:22
Sergeant
18:19 19:5,7 20:2,7,
17 27:9 28:16,21
33:14
series
8:7
service
13:8
sheet
26:19 43:3,11
sheriff
55:17,18 56:13 61:7
Sheriff's
88:15
shopping
79:11
short
23:10 24:5,14 25:3
28:6 74:8
shot
47:2
shots
43:13,14
show
42:10,11,12 43:9
54:7
showed
37:8,10,20,21,24
38:5,6 39:2,8 41:12
42:7,10,16,22 43:12,
16,19,20,21,24 44:1,
7,18 45:6,17,18
50:19 60:4 85:21
86:2,5
showing
44:13
shown
54:8
signed
40:12 55:7
silver
79:24 80:8 81:15
simply
84:6
sir
8:13,14 9:5 18:14
20:7 32:5 44:19
59:10 66:18 68:20

86:22 87:19 88:13
sit
49:19,22
sitting
79:16
six-and-a-half
9:9
small
79:11
son
60:15,16 62:12,17,
sort
40:1 56:23 67:21,22
70:13 71:21
sound
53:22
sounds
52:19
source
18:5,6,11 21:5 70:22
72:7,17,21
speak
29:21 60:8,14 83:11,
13
speaking
83:12
specific
21:24
specifically
57:11,14 80:7 83:10
84:12,20
speculation
70:15 72:24
spell
6:13 24:22
spoke
30:20,23 59:23
60:11 63:13 83:7,14,
20 84:10 85:19
squad
68:8
staked
66:8
stand
23:16
standing
80:19
stands
23:14 25:8
stapled
74:14
Star
6:15
Starks
27:20 51:10,11,13
53:12
start
59:14
started
59:12 64:3
state
6:12 10:11,21 20:21
21:7 45:13 46:12,19
85:13
State's
81:20
stated
36:1
statements
81:10
states
78:7
station
19:10,13 21:3 29:19
31:16,18 34:18,22
68:17 69:17 70:3
71:4,8,19 72:2 81:4
stations
72:10

stops
13:7 14:11,15
store
15:12 17:12,21
18:16 19:21,22 22:7,
11,19 34:17 35:15
36:4,5 44:4,12 45:4
47:6 56:18,23 57:20
65:3 79:12 80:23
strategic
65:13
street
36:12 38:13,19 50:9
55:11,20 77:3 80:3
strictly
84:7
study
85:24
stuff
21:8
subject
7:20 44:3,12 47:24
50:5 56:14 80:1
subjects
44:21,22 48:21
55:16 78:6,13,15
79:10,15 80:2,11,18
84:16
subsequently
88:20
substance
44:8
sued
10:12
supplemental
40:1 41:4 74:22
supplementary
73:13
supposed
36:3,10,11,18 44:4
49:8
suspect
15:4 16:8 17:7
suspected
17:3
suspects
27:9 28:17 30:18,24
31:4,20,24 34:10,22
35:2 53:5 77:16 87:9
Suspended
13:13
suspicious
68:1
sworn
6:6,9

T

T-shirt
56:23
table
85:22 86:2
tact
12:12,13,16,19
16:17
taking
39:12
talk
8:18 30:15,17 31:8
32:19 60:18 67:11
71:11,15,16
talked
11:24 12:4 32:15
33:14 34:12 54:4,20
71:5 76:18 81:20
88:12
talking
31:12 32:23 33:5
35:6 42:4 48:4,8
76:13,15 79:1



tattoos
23:16,18 24:7
team
16:2 57:1
telephone
65:21 69:24
telling
79:14
ten
13:17
testified
6:10 14:2 18:7,12
20:14 26:24 28:23
34:3 41:15,19 46:22
63:9
theft
45:22
thing
20:18 29:2 54:21
56:6 59:11 63:12
thought
20:9
throw
46:7
time
7:16 12:17,20,21
14:15 19:9,13 21:15
29:8 31:17 37:24
39:11 48:16 50:14
55:20 56:12,14
59:13 60:16 62:3,6
64:2 65:19 66:3,6
70:2 71:5,12,24 72:1
73:4 87:16 88:17
times
10:16
today
11:6
told
19:8,9 45:2 60:13,
16,20 63:15 64:14,
19,21 78:10,12,14
79:13,20 80:4,6,16
81:24 84:13,15
top
43:5
total
21:16 36:13,15 78:6
town
77:1
traffic
13:7 14:11
transported
66:15 72:9
travelled
88:19
truthful
48:7
turned
54:18 66:13
typed
42:23
typical
84:19

U

uh-huhs
8:23
uh-uhs
8:23
Um-hmm
49:9
umm
7:19 27:15 36:3,4
44:14 48:23 84:17
unbiased
48:12
uncooperative
13:20 14:21

undercover
12:14
understand
8:8,10 42:20
understanding
70:9 72:15,16,20
78:2
undertake
58:11
Unit
16:17 55:1 61:6 65:9
69:21 86:20 88:15
University
10:11
unknown
79:10 80:2
unmarked
12:23
unusual
28:10
upstanding
62:11

V

vehicle
12:22,23 29:7 52:14
53:1 55:14,18,21
56:1,6,8 58:12 64:20
69:5 79:15,24 80:19
vehicles
15:14 52:12 53:6,10
65:9,12
versa
16:5
vice
16:5
video
80:22 81:5,6
Village
83:3

W

wait
8:15,16 49:8 56:9
85:13,16
waited
65:20
waiting
80:18
Waived
89:6
wanted
56:8
Watson
33:7,20 34:5,16,20
35:9 44:14
ways
50:6
wear
12:14
website
45:14
week
35:21 47:20 48:3
weight
23:4,24 24:10,24
25:12 27:24
whatsoever
70:23
white
64:24
withdraw
14:16 27:6
witnesses
30:15 31:8,11 34:13
71:7
Wood
55:11,20

Woodridge
17:12,21 22:12
word
38:22,23 51:15
work
8:22 9:24 10:2,14
60:17 64:3 87:19
worked
12:19 54:17
workers
65:1
working
33:16
works
60:20
write
39:24
writing
41:1
wrong
49:6 72:19
wrote
55:7 75:13

Y

year
12:18 17:16
years
8:3 9:6,9 25:19

Z

ZIMMER
7:2 11:19 74:3 82:3
88:4,6 89:6

